BLACK GRIEVANCE COMMITTEE, et al.

v.

PHILADELPHIA ELECTRIC COMPANY.

Civ. A. No. 75–3156.

United States District Court, E.D. Pennsylvania.

Aug. 13, 1985.

Herbert Newberg, Alice W. Ballard, Samuel & Ballard, Earl W. Trent, Philadelphia, Pa., for plaintiffs.

Robert W. Maris, John F. Smith, III, Hope A. Comisky, and Alexandra D. Sandler, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for defendant.

## MEMORANDUM

GILES, District Judge.

On December 21, 1984, this court entered a Consent Decree which settled the parties' merit contentions in the above-captioned case. The plaintiff class, and named plaintiffs, have now petitioned for counsel fees and costs as the "prevailing party" in this litigation which has spanned more than ten years. Philadelphia Electric Company ("PECO") agrees that plaintiffs are prevailing parties and are entitled to some fee award. However, it contests the extent of the claimed lodestar of $537,499, and some of the expert witness expenses included in the costs claimed of over $20,000. Plaintiffs ask for an upward adjustment in the lodestar for delay in payment, contingency, quality of work, as well as what they perceive as exceptional success in the relief ultimately gained through the 1984 Consent Decree. PECO challenges any upward adjustment and contends that, after considering each of the possible adjustment factors, there should be a net downward adjustment.

Plaintiffs have filed a joint petition for counsel fees and costs. PECO's chief objection to the claimed lodestar hours focuses on the time spent by the lead attorneys, Herbert Newberg, Esquire and Alice Ballard, Esquire, in pursuing matters which were not, from defendant's viewpoint, reasonably related to this employment race discrimination litigation. It challenges as excessive the maximum hourly rates asserted by lead counsel as well as the rates claimed by Earl Trent, Esquire, who had contacts with the clients but who was rarely involved directly in pleadings or other matters which involved the court. There is no substantial challenge to the lodestar claim of Phillip Fuoco, Esquire whose time involvement was small in comparison with the claims of plaintiffs' other attorneys.

This action was initiated by the Black Grievance Committee ("BGC"), a PECO employee organization whose membership is comprised principally of black persons, and seven named plaintiffs who were members of BGC. Jurisdiction over the claims of employment discrimination based upon race was first asserted under the Civil Rights Act of 1871, 42 U.S.C. § 1981. Later, there was added a claim under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, et seq. This litigation came on the heels of a 1973 Consent Decree issued by the Honorable Louis C. Bechtle stemming from a Justice Department race discrimination lawsuit against PECO. *United States v. Philadelphia Electric Company*, 351 F.Supp. 1394 (E.D.Pa.1972). By reason of the 1973 Consent Decree, PECO agreed to affirmative action retention and promotion of minority applicants and employees.

The Justice Department was, and remains, responsible for monitoring compliance with that Consent Decree and is obligated to seek court intervention in the event of non-compliance. In the context of that federal agency failing to find non-compliance, this litigation was started. In many respects, the injunctive relief sought by the class duplicated that already gained through the existing 1973 Consent Decree goals and timetables to increase hiring of minorities. Nevertheless, this lawsuit sought across-the-board relief, monetary and injunctive, in all phases of employment activity. Actual damages were sought for all members of the class, present and former employees, beginning from January 1, 1968, together with punitive damages wherever appropriate. The putative class also included all disappointed employment applicants covering the same time period.

## I.  CALCULATION OF THE LODESTAR

■ A "lodestar" is determined by multiplying a reasonable number of hours expended during the litigation times a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

### A.  MR. NEWBERG

#### 1. *Hourly Rate*

Mr. Newberg claims hourly rates as follows:

| | | |
|---|---|---|
| 9/75 to 8/78 | — | $135 per hour |
| 9/78 to 8/80 | — | $150 per hour |
| 9/80 to 1/81 | — | $175 per hour |
| 1/82 to 12/83 | — | $200 per hour |
| 1/84 to present | — | $225 per hour |

Apparently, PECO does not contest his hourly rates for the period through 12/81, but does contend that he should be limited to an hourly rate of $175 thereafter, citing District Judge Huyett's conclusion in 1982 as to Mr. Newberg's hourly rate in another Title VII case, *Kuhn v. Philadelphia Electric Company*, C.A. No. 77–1107, Fee Order, January 20, 1982, and a civil rights action, *Institutionalized Juveniles v. Secretary of Public Welfare*, 568 F.Supp. 1020, 1034 (E.D.Pa.1983). Mr. Newberg has produced billings from some other non-contingent fee matters to evidence that he has charged some clients the rates claimed. However, there is no showing that these rates were, in fact, collected or that the maximum hourly rate charged there would be appropriate for the kind of work done in this case.

I accept the findings of Judge Huyett in *Kuhn* and *Institutionalized Juveniles* as to Mr. Newberg's maximum hourly rate of $175 as of 1983. It would appear from the billing history thereafter in non-contingent fee matters that Mr. Newberg has attempted to realize an increase in his hourly rate on a yearly basis. It would also appear that the maximum level of skill and expertise is not required to perform all the services that a client might require in the representation. It cannot be said on this record that all the rates that have been asserted by Mr. Newberg are prevailing market rates. Further, Mr. Newberg had the assistance of three other co-counsel, and particularly, another lead counsel in performing the various legal tasks associated with this case. This fact runs counter to a claim of an advanced hourly rate which presumptively represents the ability to perform all legal facets of the representation independently.

Considering all of the above factors, I find that for the period January 1982 through December 1983, an hourly rate of $175 is appropriate and reasonable and for the period of January 1984 to the present an hourly rate of $190 is fair and reason-

able. This is especially so, inasmuch as these rates will apply to all aspects of the work done by Mr. Newberg, including that which was routine and which arguably should not have been billed at a maximum hourly rate. Therefore, the hourly rates for Mr. Newberg's non-fee petition work will be reflected as follows:

| | | |
|---|---|---|
| 9/75—8/78 | — | $135 per hour |
| 9/78—8/80 | — | $150 per hour |
| 9/80—12/81 | — | $175 per hour |
| 1/82—12/83 | — | $175 per hour |
| 1/84—present | — | $190 per hour |

### 2. *Hours*

It has been agreed between the parties that Mr. Newberg's original claim of hours total 1351.9, inclusive of 3.8 hours for fee petition work. My calculations, however, show a total of 1326.4 hours. From these hours, PECO claims deductions should be made for inadequately described legal work, work on unrelated Title VII and NLRB litigation and injunctive relief improvidently sought before this court.

### (a) *Inadequately Described Work*

■ PECO seeks to exclude 115.5 hours for the period 1975 through approximately 1980 as being inadequately described by Mr. Newberg. Counsel for plaintiffs bear the burden of describing adequately the nature of the work performed. *Richerson v. Jones*, 506 F.Supp. 1259, 1264 (E.D.Pa. 1981). I have reviewed the entries for the period in question. There are many entries which certainly could be more definite. However, I am satisfied, given what is now known about the work by counsel, that the hours charged, which PECO challenges as inadequately described, are related to this multi-faceted case. Consequently, because I have no concern that improper hours are claimed, I find that these hours should be included in the lodestar.

### (b) *Chemical Spill*

In March 1979, Mr. Newberg spent 8 hours in an unsuccessful attempt to have this court enjoin the directives of Henkel & McCoy, the employer of two contingent construction work-force employees, not to return to the PECO premises to work. For what were given as safety reasons, they had refused an order of a PECO supervisor to clean up a chemical powder spill. PECO had requested that their employer not send them back there to work. Neither man was a member of the class nor a named plaintiff. Mr. Newberg contends that he believed that the incident represented a prime example of retaliation and harassment against contingent workers, in general, who were seeking to enforce their civil rights. The petition for a temporary restraining order was denied. The incident was a labor relations problem that did not pertain to the merits of the issues before the court. They were not prevailing parties on this score. Accordingly, these 8 hours will be disallowed.

### (c) *Collectors*

During the course of the litigation, plaintiffs sought a temporary restraining order on behalf of a group of collectors, employees who visit the homes of delinquent customers to collect amounts due. The collectors are authorized to cut the power lines if payment is not forthcoming. PECO had had a policy of sending out collectors in teams of two. Allegedly, after the collector workforce became predominantly black, the policy was changed such that on occasion a single collector could be sent out on the job. The plaintiffs considered this new policy to create a dangerous condition for the collectors, particularly since customers faced with a cessation of service could become hostile and threaten the collectors physically. Plaintiffs' counsel assert that their work on this aspect of the case provided them with a cameo example of PECO assigning harsher working conditions in areas where black employees were concentrated. The petition for a temporary restraining order was denied. Any grievances were resolved through PECO's personnel channels. Plaintiffs failed, therefore, to show that race was the motivation for the change in policy or that there was a need for injunctive relief. The policy under attack potentially affected white collectors and black collectors alike. Plaintiffs were

not "prevailing parties" in this supplemental action. It did not later appear through any pretrial memorandum to have been a factual basis for the relief ultimately sought in the case. Accordingly, I find that the time devoted to this activity must be deducted from the claimed lodestar. The 26 hours spent by Mr. Newberg on this matter are disallowed.

#### (d) *Final Pretrial Memorandum*

PECO also seeks reduction of the claimed lodestar by the number of hours Newberg and Ballard expended on a pretrial memorandum in January 1981. This memorandum proved to be inadequate and prompted the need for a new submission. Plaintiffs' lead counsel each spent 16 hours on its preparation, including attendance at a pretrial conference. Nevertheless, the memorandum lacked the specificity necessary to advise this court or the defendant, in a reasonable fashion, of the plaintiffs' theories. It also failed to indicate which witnesses and documents would be used in the attempt to prove these theories. However, plaintiffs contend that this submission provided the basis for the second memorandum and, therefore, was not wasted. The time spent by counsel on the first memorandum was not reasonably related to the progress of the case. The work duplicated the subsequent better directed efforts of counsel. The submission of an unsuitable final pretrial memorandum from plaintiffs at that point in time delayed the case, prompted a motion from PECO to dismiss the suit and an order of the court requiring another final pretrial memorandum. Accordingly, the 16 hours claimed by Mr. Newberg for his efforts on the first final pretrial memorandum will be disallowed.

#### (e) *The NLRB Proceedings*

The more substantial dispute concerns time charges related to plaintiffs' counsels' claims for time spent assisting the Philadelphia Regional Office of the National Labor Relations Board ("NLRB") in the investigation and prosecution of unfair labor practice charges of the Black Grievance Committee ("BGC"). The BGC contended that the organization itself and its individual members, some of whom were white, had been discriminated against by the company. It contended the company's favored treatment of the Independent Group Association ("IGA") and concomitant refusal to recognize the BGC as an authorized representative of particular employees with individual grievances against PECO resulted in their suffering discriminatory treatment. Allegedly, the IGA was accorded this recognition. Through the NLRB process, plaintiffs' counsel contend that they hoped to gain the same recognition for the BGC and thereby bring pressure on PECO to cease and desist the alleged discriminatory treatment of black workers and other members of the BGC.

Neither the BGC nor the IGA had been certified as the exclusive collective bargaining agent as a result of an NLRB conducted election or through an equivalent informal process. Relying on existing precedent, an administrative law judge ("ALJ") ruled in favor of PECO on the complaint filed by the NLRB Regional Office. The ALJ held that no violation of § 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) (1982) occurs where an employer chooses to show partiality to one employee organization over another for purposes of dealing with terms and conditions of employment when neither organization purports to represent a majority of the employees in the workplace nor seeks status as the exclusive bargaining agent under § 9(a) of the NLRA. A three member panel of the NLRB adopted the ALJ's findings and holding without opinion. 268 N.L.R.B. NO. 123 (1984). The NLRB complaint averred that the failure to accord the same status to the BGC as was given to the IGA was motivated by race. Race discrimination is not a per se violation of the NLRA. There was no determination whether there was a nexus between any alleged violation of employee rights protected under the NLRA and alleged race discrimination. The settlement of this case occurred before the Third Circuit reversed and remanded in

*Black Grievance Committee v. NLRB*, 749 F.2d 1072 (3d Cir.1984). Although the NLRB proceeding was very much a part of the settlement discussions, as is evidenced by the proposed settlement agreement, it did not become part of the Consent Decree.

Plaintiffs attempt to justify the time spent on the NLRB matter as instrumental to the discovery process in their Title VII and § 1981 cases before this court and as essential leverage for effectuating settlement of the instant case. I disagree. Any discovery of factual issues or legal principal witnesses in the NLRB matter would have had to have been duplicated in this case. The thrust of the NLRB proceeding was not whether there was race discrimination but rather whether there was a violation of organizational rights of employees protected under the NLRA. The Regional Attorney of the NLRB was in charge of prosecuting the theories of the complaint, not plaintiff's attorneys. An ALJ, and not this court, was in charge of deciding the relevancy of proferred evidence. Indeed, any determination of racial nexus in the NLRA context would have been of no controlling consequence or evidentiary value in the trial of the various race issues before this court. The NLRA proceeding was a separate proceeding from the one before this court. As important as counsels' NLRA work must have been to the BGC to enhance its stature with PECO and its employees, it is not possible to give plaintiffs' counsel credit for work that was not done in this case and which would have had to have been duplicated here had the case not settled. Moreover, this court is not in a position to judge whether plaintiffs' counsels' efforts in the NLRA proceedings were wasteful, knowledgeably pursued or duplicative of the efforts and expertise of the NLRB attorneys who were responsible under law to investigate, evaluate and press the complaint on behalf of PECO employees and the BGC. While counsel have an expertise in Title VII and § 1981 race discrimination matters, they do not hold themselves out as experts in the area of NLRA matters. For these reasons, the work by plaintiffs' counsel on the NLRA matter is not compensable in this case.

Finally, the Third Circuit's reversal did not establish a nexus between any violation of § 7 of the NLRA and alleged race discrimination. *Black Grievance Committee, supra* at 1077 n. 4. Thus, under Title VII, plaintiffs were not "prevailing parties." Mr. Newberg spent 86.7 hours on this work. Ms. Ballard spent 268.9 hours on the matter. These hours will be subtracted from the lodestar.

### (f) *Newberg Associates*

The work of the associates of Mr. Newberg will be compensated at $50.00 per hour which was the billing rate at the time their services were rendered. The hours number 169.5. Therefore, the lodestar for this work is $8,475.00 (169.5 × $50) and will be included in Mr. Newberg's portion of the lodestar.

### (g) *Paralegal and Law Student Time*

■ The plaintiffs have sought to include the time spent by paralegals and law students in the lodestar. This request is denied. Paralegals and law students work according to the directives of counsel. The assistance they provide allows counsel to spend their hours more productively on those aspects of the case requiring their skill and expertise. Consequently, counsels' hourly rate reflects the value of making that non-lawyer time productive. Although there is precedent supporting plaintiff's counsels' position, this court prefers to follow *Bogosian v. Gulf Oil Corporation*, Nos. 71–1137, 71–2543, slip op. at 7, (E.D.Pa. April 1, 1985) where the court rejected including in the lodestar, the hours of paralegals and law students. Accordingly, that time will be treated as one of the costs incurred by plaintiffs, and excluded from the lodestar.

### (h) *Fee Petition Work*

■ Plaintiffs' counsels' time spent preparing the fee petition will be compensated outside of the lodestar. The parties dispute whether this time should be calculated at the maximum hourly rate for the lawyer involved or at the minimum rate for any

associate of the law office. PECO argues for $60 an hour. This court recognizes that work done on a fee petition does not require great legal skill. *Richerson v. Jones,* 506 F.Supp. 1259, 1265 (E.D.Pa. 1981), *citing Fernandez v. Shapp,* No. 74–2959, slip op. at 9 (E.D.Pa. May 29, 1980). In this case, I find that the preparation of this fee petition warrants compensation at the hourly rates reflecting an attorney's mechanical application of established principles of law as opposed to rates which reflect some professed expertise in specialized litigation. I find that the appropriate rate is $75 per hour. The hours spent by Mr. Newberg on a motion for interim fees will be disallowed altogether. That motion was denied and this court finds that the time spent by Mr. Newberg on it was unnecessary.

(i) *Kuhn Litigation*

Mr. Newberg has erroneously charged in this case 11.5 hours for time spent on the matter of *Kuhn v. Philadelphia Electric Company.* That time will be deducted.

(j) *Summary of Deductions of Hours from Mr. Newberg's Lodestar*

| | | | |
|---|---|---|---|
| (8/78–8/80) | Chemical Spill | — | 8 hours |
| (8/78–8/80) | Collectors | — | 26 hours |
| (8/78–8/80) | Kuhn Litigation | — | 11.5 hours |
| (9/80–12/81) | Final Pretrial Memo | — | 16 hours |
| (1/82–12/83) | NLRB Proceedings | — | 86.7 hours |
| (1/84–present) | Fee Petition | — | 3.8 hours |

In addition, the charges for fee petition preparation and briefing and the paralegal and law student time will not be included in the lodestar.

(k) *Summary of Newberg Lodestar*

| Billing Period | Hours Claimed | Hours Deducted | Hours Allowed | | Rate | | |
|---|---|---|---|---|---|---|---|
| (4/75 – 8/78) | 496.5 | 0 | 496.5 | × | 135 | = | 67,027.50 |
| (8/78 – 8/80) | 340.25 | 45.5 | 294.75 | × | 150 | = | 44,212.50 |
| (9/80 – 12/81) | 138.75 | 16 | 122.75 | × | 175 | = | 21,481.25 |
| (1/82 – 12/83) | 301.5 | 86.7 | 214.8 | × | 175 | = | 37,590.00 |
| (1/84 – Present) | 49.4 | 3.8 | 46.6 | × | 190 | = | 8,664.00 |
| | | | | | | | 178,975.25 |
| Newberg Associates | 169.5 | 0 | 169.5 | × | 50 | | 8,475.00 |

NEWBERG LODESTAR TOTAL: $187,450.25

## B. MS. BALLARD

### 1. *Hourly Rate*

Ms. Ballard claims an hourly rate of $150 per hour for all work. PECO answers that the reasonable rate should be $90 per hour. In 1982 in *Kuhn v. Philadelphia Electric Company,* a class action sex discrimination against defendant, Judge Huyett determined that Ms. Ballard's hourly rate for lodestar purposes was $90. I adopt that decision as the best historical evidence of her market rate through 1982. Currently, she claims an hourly billing rate of $150. However, there is insufficient evidence that she bills all non-contingent fee hours *and* is paid consistently at that rate for all hours billed. Considering that her determined market rate was $90 in 1982, the inquiry becomes what is a fair and reasonable expectation for hourly rates in each of the succeeding years. I find that the reasonable rate for 1983 was $100 per hour; for 1984 it was $115 per hour, and for 1985 it was $125 per hour. These rates represent an increase in the skill, expertise and responsibility of counsel in the trial of employment discrimination cases which was brought to bear in concluding the litigation.

### 2. *Hours*

Ms. Ballard claims in the petition, by my calculations, a total of 1029.1 hours:

Included in these hours are 9 hours for fee petition preparation done in 1985; 268.9 hours (10.6 hours in 1980, 22.2 hours in 1981, 218.2 hours in 1982, 15.9 hours in 1983 and 2 hours in 1984) devoted to NLRB matters; 16.8 hours (.4 hours in 1980 and 16.4 hours in 1981) towards the final pre-

trial memorandum; 35.4 hours towards Collectors' Temporary Restraining Order (.7 hours in 1979 and 34.7 hours in 1980) and 9.5 hours (3.7 hours in 1979, 5.5 hours in 1980 and .3 hours in 1981) devoted to interviews of black female employees in the *Kuhn v. Philadelphia Electric Company* case. These hours will be deducted from the lodestar. Except for the hours related to the fee petition preparation, the time deducted will be disallowed for the same reasons they were disallowed in the instance of Mr. Newberg. In addition, respecting the *Kuhn* hours, presumably this time has already been compensated by Judge Huyett in his fee award. Counsel does not show the contrary to be true. Even though the *Kuhn* female plaintiffs may have also discussed black employee concerns, the time expended cannot be doubly compensated by an additional award in this case.

Therefore, Ms. Ballard's compensable hours are as follows:

| Year | Hours Claimed | Hours Deducted | Hours Allowed | | Rate | | |
|------|---------------|----------------|---------------|---|------|---|--------------|
| 1979 | 67.1 | 4.4 | 62.7 | × | 90 | = | 5,643.00 |
| 1980 | 152.0 | 51.2 | 100.8 | × | 90 | = | 9,072.00 |
| 1981 | 237.6 | 38.9 | 198.7 | × | 90 | = | 17,883.00 |
| 1982 | 261.8 | 218.2 | 43.6 | × | 90 | = | 3,924.00 |
| 1983 | 216.8 | 15.9 | 200.9 | × | 100 | = | 20,090.00 |
| 1984 | 63.2 | 2 | 61.2 | × | 115 | = | 7,038.00 |
| 1985 | 30.6 | 9 | 21.6 | × | 125 | = | 2,700.00 |
| | | | BALLARD'S LODESTAR TOTAL | | | = | $66,350.00 |

### C. MR. FUOCO

Mr. Fuoco's claimed hourly rates are not challenged by PECO. However, I do not find the asserted 1985 rate of $135 per hour justified or proven, particularly considering the allowed rate for Ms. Ballard's work. Moreover, the two hours charged in 1985 pertain to time he spent preparing the fee petition. Therefore, the two hours charged in 1985 will be compensated at the rate of $75 per hour, the rate found reasonable by this court for time spent on fee petition preparation. Since his work in 1985 pertains to preparation of the fee petition, it will be excluded for purposes of lodestar computation. His lodestar is computed as follows:

| | | | | | |
|------|-------------|-------|---|-----------|
| 1975 | 12.75 hours | at $ 65 | = | 828.75 |
| 1976 | 93.5 hours | at $ 75 | = | 7,012.50 |
| 1977 | 46.5 hours | at $ 75 | = | 3,487.50 |
| 1978 | 9.5 hours | at $ 85 | = | 807.50 |
| | FUOCO LODESTAR TOTAL | | = | $12,136.25 |

### D. MR. TRENT

Mr. Trent claims an hourly rate of $100 per hour for the period 1979–80; $115 per hour 1981–82; and $125 per hour 1983–84. His involvement in the case and, therefore, his demonstration of expertise in the litigation of Title VII cases was not as extensive as that of Ms. Ballard. He has not proven that his billings and receipts for hours worked in non-contingent fee matters during these periods averaged the claimed rates. I find that a fair and reasonable hourly rate for him is $90 per hour for all work.

Total Hours × Hourly Rate = 185.50 × $90

TRENT LODESTAR TOTAL = $16,695.00

## E. TOTAL LODESTAR

| | |
|---|---|
| Newberg | $187,450.25 |
| Ballard | 66,350.00 |
| Fuoco | 12,136.25 |
| Trent | 16,695.00 |
| | $282,631.50 |

| | | |
|---|---|---|
| Newberg letter 3/6/85 | (1.8 × $190) | 342.00 |
| Ballard letter 4/25/85 | (.40 × $125) | 50.00 |
| | | $283,023.50 |

## II. ADJUSTMENTS TO THE LODESTAR

### A. *Delay in Payment*

The lodestar having been determined, the next step will be to ascertain whether it should be adjusted upward for delay in payment. PECO concedes that it should, but argues for an adjustment not to exceed 25%. Plaintiffs argue for application of a "prevailing interest rate" concept. I reject the plaintiffs' contention. No counsel fees became potentially payable until the Consent Decree was approved at which point plaintiffs could be deemed the prevailing party. Indeed, no fees become payable until this court rules on the fee petition. A reasonable upward adjustment is appropriate for the delay in payment. Twenty-five percent is reasonable.

### B. *Contingency*

PECO contends that the contingency value of the case was such that an upward adjustment of plaintiffs' lodestar is not appropriate. I disagree. Even though there was a resolution of certain discrimination claims through the Consent Decree in *United States v. Philadelphia Electric Co., supra,* there continued to be many complaints by black employees at PECO about adverse employment practices based on race. The volume of individual complaints suggested the existence of continuing systemic discrimination in areas addressed, and not addressed, by the 1973 Consent Decree. The search for the source of those complaints through the adversary process, especially in the face of the aforementioned Consent Decree, and the fact that the United States had sought no enforcement action for non-compliance makes this an appropriate case in which to make an upward adjustment based on the contin-

gency factor. There was also considerable risk that the source of the complaints was not systemic race discrimination but a series of individual grievances stemming from employee (including plaintiffs or class members) misconduct, attitudes of fellow workers generated by community biases as opposed to company instilled or tolerated prejudices, or changes in economic circumstances. There was also a risk of discovering midstream that the power struggle for labor relations recognition by a predominantly black employee organization was a matter within the exclusive province of the NLRA and not a Title VII or § 1981 matter at all. These were some of the risks which existed at the time the case was commenced which could have dissuaded counsel from undertaking the representation. The plaintiffs have not prevailed in the sense of proving that there was discrimination. Nonetheless, they have prevailed in obtaining some affirmative action helpful to the class that was not initiated by the company on its own and which may not have been achieved but for the prosecution of this lawsuit. Balancing the risks undertaken in the context of what was not proven and the scope of the relief which was obtained, I find that an upward adjustment of .50 for the contingency factor is appropriate.

### C. *Quality of Work*

Predictably, plaintiffs urge an upward adjustment of the lodestar while defendant urges a downward adjustment based on the quality of the plaintiffs' counsels' work during the course of this litigation. Due to the complexity of the necessary proof, generated in large part by the ambitious structuring of the across-the-board claims, I find that no downward adjustment is warranted for quality. Nor do I find that an upward adjustment is appropriate.

Plaintiffs sought the broadest possible relief and the broadest possible class in their efforts to remedy what they perceived to be "patterns and practices" of discrimination. This was so, despite a 1973 Consent Decree in *United States v. Philadelphia Electric Co., supra,* in which the de-

fendant pledged to set and fulfill certain hiring and promotional goals for minorities in various categories of employment. While the efforts by plaintiffs' counsel were laudable, and certainly well-intentioned, there was much wasted time and energy. For example, the NLRB involvement detracted from discovery that should have been pursued and developed in this case on the issue of race discrimination. That ancillary proceeding became overwhelmingly concerned with the unfair labor practice charges of a white employee who was not a member of the class. Considerable effort was made to expand the class to include all white employees in the contingent work force when, in fact, those persons had interests different from, and adverse to, the black employees in the group. In fact, these white employees hired another attorney, Santo Federico, Esquire, to make known their objections to the settlement proposal. These objections demonstrate that despite the great expenditure of time in consulting with the employees, plaintiffs' counsel did not adequately determine the interests of this segment of the proposed subclass of all contingent workers.

Plaintiffs' counsels' performance in this case, in terms of complying with court schedules for completion of discovery and pretrial memorandum and, generally, readying this case for trial disposition, was not so superior as to warrant a quality adjustment above their hourly rates, as determined here, which reflect expected expertise. The case was pursued through a period when the controlling case law was in flux. Some theories of liability fell by the wayside because of decisions by appellate courts, including the Supreme Court of the United States. In all of this, counsel were looking for a key to discovery of systemic discrimination as opposed to individual discrimination. Test validation was represented as one such key. However, plaintiffs did not depose PECO's testing or statistical experts. As of the time of trial, neither plaintiffs' theories nor evidence on that score had been fully developed. Moreover, data discovered during the pending litigation showed that the statistical analysis on which plaintiffs may have been content to rest at one time was invalid.

Plaintiffs assert that because there was a settlement of value hammered out on the eve of trial, ten years after the complaint was filed, there should be an upward adjustment of the lodestar. While it is true that many months of trial were avoided by the settlement, that fact does not weigh on the side of quality work adjustment. The Consent Decree does not establish the existence of illegal discriminatory conduct, systemic or individual. A trial may have resulted in a verdict for PECO. The settlement avoided for the class and individual plaintiffs the risk of losing and of obtaining no additional affirmative action commitments from the company. The settlement terms, though of significance for the employees, generally, were not tantamount to a "win" given the contentions in the complaint. Accordingly, plaintiffs' request for an upward adjustment is denied.

### D. Hensley Analysis

In Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court held that under the Civil Rights Attorney's Fee Award Act, 42 U.S.C. § 1988, the district court must consider, among other factors, the relationship between the extent of success and the amount of the attorney fee award. The Court stated that where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.... [T]he most critical factor is the degree of success obtained." Id. at 436, 103 S.Ct. at 1941. In this case, brought under § 1981 as well as Title VII, the Civil Rights Attorney's Fee Award Act is applicable.

A Hensley analysis is appropriate to assess plaintiffs' degree of success. Plaintiffs suggest that Hensley is inapposite because plaintiffs obtained the results sought. This position fails to acknowledge the numerous objections made to the pro-

posed settlement by members of the class who complained that the relief sought by the lawsuit was not being provided. In the area of hiring, plaintiffs sought an order requiring hiring at a level to create a 33⅓% minority workforce company-wide. This was not achieved. Rather, the company agreed not to move for dissolution of the 1973 Consent Decree for a period of 3–5 years. In the areas of qualifications and testing, which were contended to be clearly discriminatory, plaintiffs failed to adduce evidence sufficient to make out a prima facie case of illegality. The Consent Decree provides for training classes for minorities interested in taking aptitude and trade qualifying tests. In the area of promotions, transfers, management selection and performance evaluations, plaintiffs had charged that the criteria being utilized by PECO were discriminatory. The plaintiffs obtained an agreement from PECO to establish a career counseling function to review career paths open to any employee and to encourage qualified employees to pursue their individual goals. Moreover, PECO agreed to develop a sensitivity training program for supervisors focusing on the problems, concerns and potentials of minority employees in the Management Training Program.

The contingent construction work force claim principally resulted in an acceleration of PECO's existing commitment to persons listed for relief in the 1973 Consent Decree and a settlement fund of $60,000 for 10 named individuals and $60,000 for the remaining contingent workers. Plaintiffs had sought individual monetary awards for 54 named workers which they ultimately failed to obtain. They had also sought an order requiring PECO to rehire the entire group of workers, who are presently on the payroll of an independent contractor, and to give all such persons full back-pay, benefits and seniority rights as though they had continued in the employ of PECO. Plaintiffs settled for no equitable relief in this area beyond that which already existed in the 1973 Consent Decree.

With respect to the general back pay claim of the class, monetary relief had been sought reaching back to January 1, 1968. Front pay and punitive damages were sought as well. The class consisted of many hundreds of past and present employees as well as a group of alleged applicant discriminatees. The potential monetary claim, then, was many millions of dollars. The Consent Decree reflects an agreement that PECO create a total fund of $500,000 which included the $120,000 already discussed which was set aside for named individuals and the contingent work force and $300,000 for minorities employed at the company from 1969–83. Eighty-Thousand dollars was to be distributed to the class members in the Electric T & D department.

Through the Consent Decree the plaintiff class did gain a voice in addressing employee grievances and disputes. PECO agreed to create a nine-member Affirmative Action Committee chaired by the Manager of Personnel and Industrial Relations. The class was given one seat on the Committee. Although the formation of this Committee had not specifically been sought, it was an innovative step towards a monitoring alternative to close court supervision of the Consent Decree. Further, the Committee concept has an advantage of redressing grievances and resolving employee concerns before they might escalate into formal discrimination charges and lawsuits.

Plaintiffs did not obtain through settlement the extensive monetary or injunctive relief for individuals and class members as was originally envisioned. A comparative analysis of the plaintiffs' demands and the final settlement in the Consent Decree would suggest that only about 25% of the objective relief was obtained. However, it is my belief that the value to the class of the affirmative action steps included are of immediate and long-range significance and benefit to the class and warrants an added factor of 50%. Accordingly, under a *Hensley* analysis, plaintiffs successfully achieved only 75% of the relief sought. Therefore, plaintiffs' lodestar shall be adjusted downward by 25%.

### Net Adjustments to Lodestar

| | |
|---|---|
| Delay in Payment | + .25 |
| Contingency | + .50 |
| Quality of Work | .00 |
| Time & Expense Saved | .00 |
| Furthering the Civil Rights Law | .00 |
| Hensley Analysis | ± .25 |
| NET | + .50 |

### Adjusted Lodestar Fee Award

$283,023.50 increased by .50 = $424,535.25

I will not allocate the fee award between the attorneys because the disallowed time devoted by any one lawyer may cause a disproportionate allocation. For example, Ms. Ballard spent over 260 hours on NLRB work which was disallowed. Since the attorneys made a joint decision as to allocation of work, I will leave it to them in the first instance to make an allocation of the fee.

### Costs

■ Attorneys Newberg and Ballard claim expert witness expenses relating to Drs. Brent Baxter and James Kirkpatrick, who reviewed test validation studies previously conducted by PECO, and Regan R. Rockhill, a certified public accountant, who testified at the settlement approval hearing on the costs to PECO of implementation of the proposed consent decree. I find that these expenses were reasonably related to the prosecution of the merits and the settlement of the case.

The costs of travel, postage, overtime typists, and telephone usage, will be excluded as expenses included in overhead contemplated by the hourly rates awarded and as other than extraordinary costs. *Vecchione v. Wohlgemuth*, 481 F.Supp. 776, 798–800 (E.D.Pa.1979). The costs of photocopying, programming and computer use will be allowed as reasonably necessary to the test validation review by plaintiffs and their experts. The costs of deposition transcripts will be allowed, except for the transcript of attorney Robert Orcutt, who was a collector.

Accordingly, for Ms. Ballard the total allowable costs are

| | |
|---|---|
| Paralegals | $18,328.00 |
| Law Students | 5,750.00 |
| Expert Witnesses | 5,716.71 |
| Programmer | 500.00 |
| Computer Facility | 1,507.42 |
| Photocopying | 173.30 |
| Deposition Transcripts | 756.00 |
| | $32,731.43 |

For Mr. Newberg the total allowable costs are

| | |
|---|---|
| Expert Witnesses | $ 7,497.59 |
| Computer | 500.00 |
| Deposition Transcripts & Tapes | 649.34 |
| Court Reporter | 723.60 |
| Notary | 2.50 |
| Photocopying | 1,625.97 |
| | $10,999.00 |

### Fee Petition Preparation

I have found that the appropriate hourly rate is $75.00 for time spent preparing the fee petition and that the time expended on fee petition preparation was reasonable. However, the time expended on the motion for interim fees has been disallowed as unreasonable.

**Mr. Newberg**

| | | | | |
|---|---|---|---|---|
| Original Petition | 45.1 | × | 75 | 3,382.50 |
| Reply Brief re Fees | 25.1 | × | 75 | 1,882.50 |
| Letter 3/6/85 | 1.5 | × | 75 | 112.50 |
| | | | | $5,377.50 |

**Ms. Ballard**

| | | | | |
|---|---|---|---|---|
| Original Petition | 23.2 | × | 75 | 1,740.00 |
| Reply Brief re Fees | 3.3 | × | 75 | 247.50 |
| Letter 4/25/85 | 2.1 | × | 75 | 157.50 |
| | | | | $2,145.00 |

**Mr. Fuoco**

| | | | | |
|---|---|---|---|---|
| Original Petition | 2 | × | 75 | 150.00 |
| | | TOTAL | | $7,672.50 |

| | |
|---|---|
| Joint Attorneys Fee | $424,535.25 |
| Ballard's Costs | 32,731.43 |
| Newberg's Costs | 10,999.00 |
| Ballard's Fee Petition Preparation | 2,145.00 |
| Newberg's Fee Petition Preparation | 5,377.50 |
| Fuoco's Fee Petition Preparation | 150.00 |
| | $475,938.18 |

■ Accordingly, PECO shall pay to plaintiffs' counsel a joint attorneys' fee of $424,535.25 together with costs of $32,-731.43 and a fee petition preparation award of $2,145.00 payable to Ms. Ballard, costs

of $10,999.00 and a fee petition preparation award of $5,377.50 payable to Mr. Newberg and a fee petition preparation award of $150.00 payable to Mr. Fuoco.

An appropriate order follows.