**BLACK GRIEVANCE COMMITTEE, et al.**

v.

**PHILADELPHIA ELECTRIC COMPANY.**

**Civ. A. No. 75–3156.**

United States District Court, E.D. Pennsylvania.

June 20, 1988.

Alice W. Ballard, Samuel & Ballard, Herb Newberg, Earl W. Trent, Jr., for Black Grievance Committee.

Frank Finch, III, Philadelphia, Pa., Robert W. Maris, John F. Smith, III, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for Philadelphia Elec. Co.

## MEMORANDUM

GILES, District Judge.

This memorandum determines attorneys' fees in an employment discrimination case

following remand from the United States Supreme Court, —— U.S. ——, 107 S.Ct. 3255, 97 L.Ed.2d 754, and the United States Court of Appeals for the Third Circuit, 825 F.2d 768. A brief account of the facts follows. A more complete discussion of the underlying case is reported at *Black Grievance Committee v. Philadelphia Electric Co.*, 615 F.Supp. 1069 (E.D.Pa. 1985), and 802 F.2d 648 (3d Cir.1986).

The underlying action was filed by the Black Grievance Committee (BGC) and seven individual employees of the Philadelphia Electric Company (PECO) in November, 1975. The complaint asserted claims under 42 U.S.C. § 1981 (1982) and was amended to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–17 (1982). A class of employees was certified in 1978 and trial was set for July, 1983. The case settled on the eve of trial.

The litigation came on the heels of a 1973 Consent Decree issued in a race discrimination suit instituted against PECO by the United States Justice Department. *See United States v. Philadelphia Electric Co.*, 351 F.Supp. 1394 (E.D.Pa.1972). Under the decree, PECO had agreed to affirmative action retention and promotion of minority applicants and employees. That 1973 Consent Decree remained in effect at the time of settlement of this case. Plaintiffs had attempted to obtain relief not allegedly afforded by the existing decree.

The settlement of this case also took the form of a consent decree following approval of the settlement agreement by this court in December, 1984. However, the consent decree did not address the issue of attorneys' fees. Thereafter, plaintiffs' counsel filed a joint petition for attorneys' fees under Title VII and 42 U.S.C. § 1988.

On August 13, 1985, this court ordered PECO to pay the attorneys for the plaintiffs $424,535.25 in attorneys fees, $7,672.50 for time spent on the fee petition, and $43,730.43 in costs. Defendant appealed this award and plaintiffs cross-appealed. On September 22, 1986, the third circuit held that this court had been correct in some aspects of its analysis and incorrect in others. The court of appeals vacated the original fee award and remanded for reconsideration in light of its rulings.

PECO filed a petition for writ of certiorari in the Supreme Court challenging this court's decision to (1) increase the award by 50 percent to compensate for the fact that the case was taken on a contingency basis and (2) decrease the award by only 25 percent because the plaintiffs were not successful on all their claims. The Supreme Court vacated and remanded for reconsideration of the contingency enhancer in light of *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, —— U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*). The Court did not address the issue of reducing the award on the grounds of plaintiffs' success. The third circuit then remanded the matter to this court for proceedings consistent with *Delaware Valley II* and with its original opinion of September 22, 1986. The third circuit also directed this court to consider the effect of *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 479 U.S. 1080, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), on the issue of expert witness fees.

## I. THE LODESTAR

■ The third circuit held on appeal that this court erred in its calculation of the lodestar because it reduced certain undisputed hourly rates. The third circuit remanded and directed this court to recalculate the lodestar according to the rates set out in the uncontested affidavits.

The court of appeals summarized the rates to be used as follows:

| | Time | Rate to be Used on Remand |
|---|---|---|
| Newberg | 9/75–8/78 | $135.00/hour |
| | 9/78–8/80 | $150.00/hour |
| | 9/80–12/81 | $175.00/hour |
| | 1/82–12/83 | $175.00/hour |
| | 1/84–8/85 | $225.00/hour |
| Ballard | 1/79–10/80 | $ 90.00/hour |
| | 10/80–12/82 | $ 90.00/hour |
| | 1/83–12/83 | $125.00/hour |
| | 1/84–7/84 | $125.00/hour |
| | 8/84–8/85 | $150.00/hour |
| Trent | 1979–1980 | $100.00/hour |
| | 1981–1982 | $115.00/hour |
| | 1983–1984 | $125.00/hour |

802 F.2d at 653.

The third circuit instructed, however, that this court should consider any testimony PECO may offer that these rates were unreasonable. 802 F.2d at 657. Therefore, upon remand defendant had the burden of presenting evidence on this point.

■■■ PECO challenges the rates offered in the affidavits by attorneys Trent and Newberg on the grounds that both attorneys failed to provide sufficient evidence in support of their proposed billing rates. It contends that Trent did not supply any evidence of non-contingent billing paid by clients in the relevant period and that he relied on a market rate standard for the Philadelphia area. PECO further contends that Newberg produced only a few non-contingent billings for the relevant period and that those were bills submitted to other counsel for consulting work. Defendant's Response, Ex. A, Maris Aff. PECO argues that, because it has offered "countervailing evidence," this court is free to exercise its discretion and reduce the hourly rates.

The Maris affidavit does not contain any evidence sufficient to change the rates set by the third circuit. The affidavit does not challenge the reasonableness of the rates; it simply challenges the sufficiency of the original rate affidavits. The burden was on PECO to show the rates to be unreasonable and not on the plaintiffs to show the rates to be reasonable. Defendant has not carried that burden.

The reasonable value of an attorney's time is the price that time normally commands in the marketplace and is normally reflected in the attorney's billing rate. 802 F.2d at 652 (citing *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 590–91 (3d Cir.1984)). Defendant has not shown that either Trent's or Newberg's rates were (1) not the price normally commanded in the marketplace or (2) not the attorney's actual billing rate. Thus, defendants have not presented this court with any evidence as to the reasonableness of the rates set by the third circuit and the lodestar is set at $293,728, as shown in Table 1.

## II. THE LODESTAR ADJUSTMENTS

The third circuit held in *Black Grievance Committee* that a district court should first apply the result-obtained adjustment, or the *"Hensley* reducer," to the lodestar. The court should then make the contingency and delay adjustments, multiplying these factors by the result-obtained-adjusted lodestar. 802 F.2d at 656.

### A. The Hensley Reducer

In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court held that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the result obtained." 461 U.S. at 440, 103 S.Ct. at 1943. This is a matter of discretion and there is no precise formula for making such a determination. *Id.* at 436–37, 103 S.Ct. at 1941.

This court originally adjusted plaintiff's lodestar downward by 25% because plaintiffs were not completely successful in obtaining the relief sought. PECO appealed that ruling on the grounds that (1) the district court should have used a mechanical comparison of plaintiffs' claims against relief obtained and (2) the court erred in adding a 50% "value to the class" factor to its *Hensley* adjustment. The third circuit held that the *Hensley* court had rejected the mechanical method of comparison suggested by defendant. In addition, the court of appeals held that the "value to the class" factor considered by this court was not inconsistent with the overall result analysis of *Hensley* and concluded that this court did not abuse its discretion in making the 25% downward adjustment. 802 F.2d at 654.

■■ Plaintiffs contend that this court cannot revise the 25% *Hensley* reducer because it was affirmed by the third circuit and was not considered by the Supreme Court. However, the Court vacated the entire third circuit order and decision and remanded. This court is thus free to reconsider its original *Hensley* analysis.

In *Hensley*, the Court established two methods of fee reduction. The first method was to reduce the lodestar "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims." 461 U.S. at 440, 103 S.Ct. at 1943. *See also Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 919 (3d Cir.1985). The second method was a general reduction of the lodestar, "*i.e.*, of the net lodestar amount, taking into account any reduction in the initial lodestar for litigating wholly unsuccessful claims, so that the award provides 'only that amount of fees that is reasonable in relation to the results obtained.'" *Institutionalized Juveniles*, 758 F.2d at 919 (quoting *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943).

This court concluded in its original opinion that:

> it is my belief that the value to the class of the affirmative action steps included are of immediate and long range significance and benefit to the class and warrants an added factor of 50%.

615 F.Supp. at 1079.

*Hensley* does not provide for a manipulation of the reducer because of "value to the class." The third circuit stated that this approach was not inconsistent with *Hensley* because, under *Hensley*, it was the overall result of the litigation that mattered. 802 F.2d at 654, citing (*Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943). However, I believe that my original analysis took factors other than the "overall result of the litigation" into account. The phrase "value to the class" more accurately reflected compensation to plaintiffs' counsel for the risk of taking on this particular case. The desire to compensate plaintiffs' counsel for this risk is more properly addressed in determining a contingency enhancer and for that reason, I must recalculate the *Hensley* reducer.

■ Further, defendant argued on appeal that this court considered the success factor twice, once in determining the *Hensley* reducer and again in calculating the contingency enhancer. The court of appeals held that it was "unable to say with confidence whether or not the relief obtained played any role in [the] assessment of the contingency adjustment." 802 F.2d at 655. The court specifically requested that this court clarify the rationale behind its contingency award and, if relief obtained played any role, reconsider the award without reference to the relief obtained. 802 F.2d at 655.

I conclude that my original analysis of the contingency enhancer balanced the risks faced by counsel against the results obtained. *See* 615 F.Supp. at 1077. In light of the third circuit's instructions and the Supreme Court's later decision in *Delaware Valley II*, it is now apparent that no weight should have been given to the results obtained in determining contingency, but should have been left for the *Hensley* analysis. My original consideration intertwined the two factors. Accordingly, reconsideration of both is now appropriate.

The Supreme Court in *Hensley* rejected a mathematical comparison of the total number of issues in the case with those actually prevailed upon. 461 U.S. at 435 n. 11, 103 S.Ct. at 1940 n. 11. I agree that a mechanical comparison would not be helpful to the analysis. I now believe, however, that this court must look at the general areas in which relief was sought, the relief requested, and the relief achieved in the Consent Decree. The court can then better judge the plaintiffs' degree of success in each category and arrive at a fair assessment of plaintiffs' total degree of success. This is not a mechanical approach. It is simply a way for this court to map out plaintiffs' successes and failures so it can meaningfully exercise its discretion in its results-obtained analysis.

Moreover, this method of analysis is in keeping with the second method suggested in *Hensley*, that of a general reduction of the lodestar. Rather than putting an arbitrary number on the case, I choose to break my analysis down in order to arrive at a number which is better grounded in fact.

## HIRING

Plaintiffs' claim— an order requiring hiring at a level of 33⅓% minority workforce company-wide

Consent Decree— Company agreed not to move for dissolution of the 1973 Consent Decree for a period of 3–5 years; hiring goals for a 15% floor for 5 trade jobs.
Degree of Success—10%

### BACKPAY AND PUNITIVE DAMAGES

Plaintiffs' claim— $7.2 million
Consent Decree— total fund of $500,000; $120,000 of which was set aside for named individuals and the contingent work force and $300,000 of which went to minorities employed from 1969–1983.
Degree of Success—12%

### TESTING

Plaintiffs' claim— Preparatory classes; disparate impact tests; 6 month on-job training program prior to any testing, complete suspension of several tests.
Consent Decree— Training program to prepare employees for examination which is to last for five years; supplemental training and retests for those who fail.
Degree successful— 30%

### PROMOTIONS/FIRINGS

Plaintiffs' claim— Targets and timetables for promotion of minorities to supervisory positions; new procedures for making decisions which circumvent management; reinstatement of eight named individuals.
Consent Decree— No dissolution of 1973 Consent Decree for three years; career counseling program established; sensitivity training program established; company review of terminations.
Degree of success—50%

### CONTINGENT CONSTRUCTION WORKERS

Plaintiffs' claim— Reemployment of all former contigent constructions workers at PECO with full backpay, benefits, and seniority.
Consent Decree— $60,000 settlement fund; no equitable relief.
Degree of Success—22%

### INDIVIDUAL RELIEF

Plaintiffs' claim— Backpay and injunctive relief for 54 named individuals.
Consent Decree— $60,000 for 10 named individuals; no equitable relief.
Degree of success—20%

### GRIEVANCE PROCEDURES

Plaintiffs' claim— [not specifically sought]
Consent Decree— Creation of a nine-member Affirmative Action Committee chaired by the Manager of Personnel; class given one seat on panel.
Degree of success—30% success in achievement of plaintiff's overall goals.

Average Rate of Success—25%. The total lodestar for each year will be multiplied by 25% to arrive at the adjusted lodestar. *See* Table 2.

### B. *Contingency Enhancer*

■ This court originally awarded the plaintiffs an upward adjustment of 50% based upon an analysis of the risk of loss balanced against the scope of relief obtained. 615 F.Supp. at 1077. The third circuit held on appeal that this court's findings were not clearly erroneous. 802 F.2d at 655. On appeal to the Supreme Court, the Court vacated and remanded the matter for reconsideration in light of *Delaware Valley II.*

The third circuit has interpreted the Supreme Court's 4–1–4 decision in *Delaware Valley II* as upholding the availability of contingency multipliers but refusing to apply one in that case. Four justices would have held such multipliers to be "impermissible under the usual fee-shifting statutes." *See* 107 S.Ct. at 3087 (White, J., joined by Rehnquist, C.J., Powell, J., and Scalia, J.). Four justices would have permitted them. *See* 107 S.Ct. at 3091 (Blackmun, J., and Stevens, J., dissenting). Justice O'Connor concurred with the White plurality that an enhancer was not appropriate in *Delaware Valley II* but agreed with the dissenters that contingency fee enhancers might be appropriate in certain cases. Because the four dissenters would allow contingency multipliers in all cases in which Justice O'Connor would allow them, her position commands a majority of the court. *Student Public Interest Research Group of New Jersey, Inc. et al. v. AT & T Bell Laboratories, (SPIRG)* 842 F.2d 1436, 1451 (3d Cir.1988). *See also Blum v. Witco,* 829 F.2d 367, 379–82 (3d Cir.1987).

The third circuit has read *Delaware Valley II* as holding that a contingency enhancer may be available where there is a risk of non-payment. The panel in *SPIRG* stated that it was their belief that Justice O'Connor would agree with the four dissenters that "it is the fact of contingency, not the likelihood of success in any particular case, that mandates an increase in an attorney's fee...." *SPIRG,* 842 F.2d at 1451 (quoting *Delaware Valley II,* 107 S.Ct. at 3098 (Blackmun, J., dissenting)).

The court in *SPIRG* also stated that *Delaware Valley II* establishes that the "ultimate inquiry in establishing a reasonable fee must be the rate necessary to attract competent counsel." *SPIRG*, 842 F.2d at 1452. *See Delaware Valley II*, 107 S.Ct. at 3091 (White, J. plurality opinion) (O'Connor, J., concurring). However, courts interpreting *Delaware Valley II* have found that Justice O'Connor's opinion emphasizes that contingency multipliers should be granted only in rare cases. *See SPIRG*, 842 F.2d at 1452; *Coup v. Heckler*, 834 F.2d 313, 324 (3d Cir.1987) (observes that *Delaware Valley II* "severely limits the occasions in which contingency fee enhancement is appropriate in fee-shifting cases"); *Blum v. Witco*, 829 F.2d 367, 380 ("at least five justices have indicated through the tenor of their opinions that the plaintiff has a significant burden to carry to justify a contingency multiplier").

In *SPIRG*, the third circuit held that, although SPIRG's case appeared to qualify for a contingency fee multiplier because plaintiff's counsel faced the risk of non-payment, it was "not among those rare cases that deserves such enhancement." *SPIRG*, 842 F.2d at 1452.

The court so found based on its conclusions that the case was not particularly risky, that the administrative problems in determining and applying the multiplier were enormous, and that the lodestar was sufficient to attract competent counsel. *SPIRG*, 842 F.2d at 1452. On this last and most important factor, the court stated:

> In the final analysis, however, we rely on the one clear message that we can derive from *Delaware Valley II:* contingency multipliers are only available to the extent they are necessary to attract competent counsel. Because we feel that in granting the community market rate we have assured that the fee is sufficient to attract competent counsel, we will not disturb the district court's holding that no contingency enhancement was necessary in this case.

*SPIRG*, 842 F.2d at 1452.

Plaintiffs argue that *SPIRG* does not apply to the present case for the following reasons:

(1) *SPIRG* involved a law firm which intentionally charged at below market rates while the present case involves lawyers who regularly charge full rates or rely on court-ordered fee awards. I fail to see how this makes a difference. *SPIRG* analyzed whether an enhancer should be added to a lodestar consisting of a reasonable market rate times the hours worked. That situation is identical to the one at hand.

(2) *SPIRG* was not a "risky" case, while the present case was an extremely difficult one, both in terms of the complex legal issues and in problems of proof. I will not address this issue, since it appears that the riskiness of the *particular* case should not be considered. In *Delaware Valley II*, five justices agreed that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case." 107 S.Ct. at 3089 (O'Connor, J., concurring quoting Justice White at 3087) (emphasis in original). *See Blum v. Witco*, 829 F.2d at 379–80.

(3) *SPIRG* plaintiffs presented no evidence on the difficulties of obtaining counsel or on the manner in which contingent fee litigation is compensated in the relevant community. Here, plaintiffs have submitted affidavits on these points.

I agree with plaintiffs that the third circuit's decision not to award a contingency enhancer in *SPIRG* is not binding on this court. Yet, considering the type of case this was, along with the affidavits submitted by plaintiffs' counsel, I conclude that a contingency enhancer here is appropriate.

PECO claims that because plaintiffs did not appeal this court's original decision to award a 50% contingency enhancer they are now barred from seeking more than the 50% award on the grounds of res judicata. That contention is without merit. The Supreme Court vacated this court's ruling on the issue of a contingency enhancer and remanded for reconsideration in light of *Delaware Valley II*. *Philadelphia Electric Company v. Black Grievance Com-*

*mittee,* —— U.S. ——, 107 S.Ct. 3255, 97 L.Ed.2d 754 (1987). This requires the development of the record on the issues of contingency and plaintiffs' ability to attract competent counsel, issues not developed in the original fee petition or decision. As discussed in *Blum v. Witco,* this court must "tackle the task of translating the [Supreme Court's] message into a blueprint for an evidentiary hearing...." 829 F.2d at 380.

Plaintiffs' have submitted affidavits which contend that attorneys in the Philadelphia area will accept contingent cases in this type case only if their recovery would be at least double their normal hourly billing rate. For example, Henry T. Reath, an experienced lawyer and partner in the firm of Duane, Morris & Hecksher, stated in his affidavit:

> In order to obtain approval of the [firm's] Contingent Fee Committee [to take the contingent fee case], there must be a strong showing at the outset of litigation that the chances of success are favorable. In addition to this showing, a case will not be approved for contingent representation unless the firm has a reasonable expectation of receiving at least double or triple its normal hourly fees in the event of success.

Reath Aff., Plaintiffs' Ex. M, ¶ 7. *See also* Plaintiffs' Exhibits H, ¶ 11; I, ¶¶ 5, 6; J, ¶ 12; K, ¶ 14; L, ¶ 18.

In addition to the plaintiffs' showing regarding contingency fee cases, plaintiffs also have the burden of showing that competent Philadelphia civil rights attorneys will not undertake such cases without the prospect of receiving a contingency enhancer to compensate them for their risks. The third circuit stated in *SPIRG* that the "one clear message" from *Delaware Valley II* is that "contingency multipliers are only available to the extent they are necessary to attract competent counsel." *SPIRG,* 842 F.2d at 1452.

Plaintiffs have submitted affidavits on this point. For example, Michael P. Malakoff, of Berger Kapetan Malakoff & Myers, P.C., stated in his affidavit:

> I would estimate that during the period 1971 to 1980 more than 50% of my total professional time was expended in plaintiff civil rights cases primarily in the employment discrimination area. Currently I am not handling any employment discrimination cases. Today I spend less than 5% of my professional time in civil rights cases. The primary reason for this change in the nature of my firm's legal practice was that the economic risks which we assumed in this category of cases were not adequately compensated.

Malakoff Aff., Plaintiff's Ex. L, ¶ 8.

Similarly, Mr. Reath, of Duane, Morris & Heckscher, stated:

> The Contingent Fee Committee [of our firm] has not been reluctant to turn away business, and has only approved contingent fee representation in a few instances in which the prospect of fee recovery accounted for an enhancement for contingency....

Reath Aff., Plaintiffs' Ex. M, ¶ 8. *See also* Plaintiffs' Exhbts. G, ¶ 6; I, ¶ 4; J, ¶ 7.

On the issue of employment discrimination cases as a class, Alan M. Lerner, a partner in Cohen, Shapiro, Polisher, Shiekman and Cohen and an adjunct professor at Temple University Law School, stated:

> Discrimination is subtle, requiring in most cases proof of intent in the absence of direct evidence, i.e, by inference from frequently inconclusive evidence. Thus every plaintiff's representation taken on a contingent fee bases brings with it a high degree of risk of loss. Moreover, because a verdict against the defendant usually points to identifiable managers as having been guilty of intentional discrimination, companies defend these cases intensely.

Lerner Aff., Plaintiffs' Ex. K, ¶ H.

Defendant has not made any attempt to contradict plaintiffs' affidavits by producing evidence that there are attorneys in the Philadelphia area who will undertake employment discrimination cases on a purely contingent fee basis. Defendant argues instead that plaintiffs' proffered evidence is worthless because it has no statistical

validity. Defendants' expert, Dr. John S. de Cani, concludes in his affidavit:

> Plaintiffs' petition makes no attempt to obtain a carefully drawn random sample of attorneys and does not examine any cases.... No supporting calculations and no measure of sampling reliability are supplied. Plaintiffs' method of estimating the contingency multiplier has no statistical validity; consequently, neither has plaintiffs' estimate of the contingency multiplier.

de Cani Aff., Defendant's Ex. C, ¶ 7.

Plaintiffs admit that their affidavits do not have any statistical significance. They contend, however, that the affidavits are an alternative method for addressing both the market treatment of contingency fee cases as a class and the difficulty of obtaining counsel, as proposed by the third circuit in *Blum v. Witco*, 829 F.2d at 380–81. In *Blum*, the third circuit suggested ways that a record might be developed to enable a district court to rule on the necessity of a contingency enhancer. The court of appeals suggested econometric models and studies on the issues of (1) how contingency fee cases are treated in the market and (2) the fee awards necessary to attract competent counsel. The court also stated that district courts may wish to consider whether such studies are feasible in light of their extreme expense and whether there are alternatives that will meet the *Delaware Valley II* test. Plaintiffs contend that their submission of the affidavits is a practical and less expensive method which meets the *Delaware Valley II* requirements. *Blum*, 829 F.2d at 381.

I find that plaintiffs' evidence is sufficient to support the award of a contingency enhancer. While plaintiffs' evidence is not, as Dr. de Cani contends, statistically significant, it does meet the requirements of *Delaware Valley II*. Plaintiffs have submitted affidavits from eight established and experienced local attorneys. Plaintiffs have shown through this uncontested evidence that the market compensates for contingency cases at a rate of approximately 200% and that it would be significantly more difficult for plaintiffs to obtain coun-

sel willing to handle employment discrimination class actions if plaintiff's counsel had no prospect of receiving a contingency enhancer. Plaintiffs' evidence is adequate and uncontested.

The court in *Palmer v. Shultz*, 679 F.Supp. 68, 74–76 (D.D.C.1988), considered similar affidavits from Washington D.C. attorneys on the subject of contingent fee compensation. The district court concluded in *Palmer* that the defendant's arguments attacking the sufficiency of the plaintiffs' evidence "misconceive the *Delaware Valley II* inquiry which focuses itself specifically on the question of whether, absent a contingency enhancement, plaintiffs would have faced substantial difficulty in obtaining counsel in the relevant market...." *Palmer*, 679 F.Supp. at 75. The court awarded a contingency fee multiplier.

Similarly, in *Hidle v. Geneva County Bd. of Educ.*, 681 F.Supp. 752 (M.D.Ala. 1988), the court held that the circumstances necessary for a fee enhancement existed in that case. The court noted that lawyers in Alabama who take cases on a contingency basis are highly compensated for taking the risk that they will be paid only in the event of success. The court also concluded that the evidence before it convincingly reflected that "Alabama citizens who believe they are victims of discrimination would face substantial, and often insurmountable, obstacles in finding counsel absent the likelihood of fee enhancement for contingency." 681 F.Supp. at 758. The court awarded a 100 percent adjustment because it felt that this amount would bring the fee within the range that would attract competent counsel but would not produce a windfall for the attorneys. 681 F.Supp. at 758. It also noted that the evidence presented to it reflected a statewide survey and that a higher contingency might have been appropriate if the survey was limited to Montgomery, Alabama, an urban area. 681 F.Supp. at 758 n. 4.

I likewise conclude that, based on the affidavits, a 200 percent enhancer is necessary to attract competent counsel without producing a windfall for the attorneys. *See* Table 2.

## C. Delay Enhancer

■ In its original fee award, this court ruled that a 25 percent upward adjustment for delay in payment was reasonable. This adjustment was based on this court's belief that no counsel fees become payable until the court has ruled on the fee petition. 615 F.Supp. at 1077. The third circuit reversed and remanded on the grounds that this court did not consider the "appropriate time period for which the delay-in-payment adjustment is designed to compensate." 802 F.2d at 656. The court of appeals reasoned that the statutory fees are designed to compensate an attorney as if the client were paying a normal fee. The "delay-in-payment adjustment" is designed to compensate the attorney for the gap between the attorney's services and the fee award. The time period following the fee award, on the other hand, is covered by post-judgment interest under 28 U.S.C. § 1961. 802 F.2d at 656.[1] The appellate court also emphasized that delay compensation does not depend on the type of case or on the quality of representation, but is based only on the cost to the law firm of waiting to be paid. *SPIRG*, 842 F.2d at 1453 (citing, *BGC*, 802 F.2d at 656). The burden is on the plaintiffs to establish the need for delay enhancement. *SPIRG*, 842 F.2d at 1453.

In *Institutionalized Juveniles*, the court emphasized the need for "carefully developed evidence of the costs to plaintiffs of receiving the delayed payment for services." 758 F.2d at 923. The court set forth the type of evidence required to establish the need for enhancement, including prevailing interest rates and market rates for attorneys' services. The court concluded that the plaintiffs in that case had not sustained the burden of documenting a need for a multiplier. The court found that the plaintiffs had presented "only very primitive evidence of the costs they incurred" to the district court. 758 F.2d at 923. The court stated:

By relying on evidence of the combined inflation rate, plaintiffs failed to offer the district court the best indicator of their costs of receiving delayed payment of fees. Evidence of the rate of market interest and the time value of money would have been far more relevant to the district court.

758 F.2d at 923. The appellate court held that, as a result of plaintiffs' failure to sustain its burden, the district court did not abuse its discretion in awarding a 25 percent multiplier. *See also SPIRG*, 842 F.2d at 1454 (appellate court found plaintiffs failed to make any showing regarding costs incurred and upheld district court's denial of delay damages).

Plaintiffs argue that this case differs from both *Institutionalized Juveniles* and *SPIRG* because plaintiffs have provided ample evidence of the costs they impaired as a result of delay. Plaintiffs have calculated the delay award using prime rate of interest figures, current market rates for legal services, and inflation rates. *See* Plaintiffs' Petition, Tables 3, 4, 5, pp. 13–16. Plaintiffs correctly argue that the third circuit favors the use of interest rates to calculate the delay enhancer. The court stated in *Institutionalized Juveniles:*

We question, however, the method of compensating delay in payment suggested by [*Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C.Cir.1984)] because changes in the hourly market rate will likely be more closely correlated to the rate of inflation than to the market rate of interest. The *Murray* calculation may tend to underestimate the cost of the delay in payment, as a general matter.

758 F.2d at 923 n. 41. *See also SPIRG*, 842 F.2d at 1453 (citing *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)) ("fee enhancement to compensate for delay is essentially equivalent to an award of interest").

Defendant has not rebutted any of plaintiffs' evidence of their costs due to delay. Defendant argues only that this court

---

1. The appellate court misread this court's decision in the original fee award. The 25% award *was intended* to cover the time gap between the attorneys' services and the fee award. The

statement that "no fees become payable until this court rules on a fee petition" was the rationale behind this court's rejection of plaintiffs' "prevailing interest rate" concept.

should adhere to its original award of a 25 percent increase for delay. Defendant cites the "substantial responsibility of plaintiffs' counsel for the delay in the case" and the "modest result obtained in the settlement" as grounds for the 25 percent increase. However, defendant has not presented any evidence as to the amount of delay plaintiffs' counsel allegedly caused. Moreover, as discussed above, delay compensation does not depend upon the quality of representation. *SPIRG*, 842 F.2d at 1452–53. Any consideration of the results obtained in the litigation should be done, and was done, in the *Hensley* analysis. Therefore, I will calculate the delay enhancer based upon the uncontested market interest rates. *See* Table 3.

### III. EXPERT FEES

In the original fee award, this court awarded plaintiffs $13,213.30 in costs for expert witnesses. These costs were awarded to cover plaintiffs' payments to two industrial psychologists and a certified public accountant. Defendant appealed this award arguing that this court did not articulate its reasons for allowing the award which was greater than the standard witness fees allowed under 28 U.S.C. § 1821. The third circuit reversed and remanded to this court, holding that "a district court has 'equitable discretion' to award expert fees beyond those provided for in section 1821 when the expert's testimony is indispensable to the determination of the case." *Black Grievance Committee*, 802 F.2d at 657 (citing *Roberts v. S.S. Kyriakoula D. Lemos*, 651 F.2d 201, 206 (3d Cir.1981)). Following the Supreme Court's decision in this case, the third circuit also ordered that the district court consider the effect of *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, —— U.S. ——, [107 S.Ct. 2494, 96 L.Ed.2d 385 (1987)], on the expert witness fee expenses issued.

In *Crawford* the Supreme Court held that when a prevailing party seeks reimbursement for expert witness fees, a federal court is bound by the $30 per day limit of 28 U.S.C. §§ 1821 and 1920, absent a contract or explicit statutory authority to the contrary. 107 S.Ct. at 2496.

*Crawford* does not apply to fees sought, as here, under 42 U.S.C. § 1988. The Court in *Crawford* noted that Congress had broadened attorney's fee awards through its enactment of 42 U.S.C. § 1988, but had "not otherwise 'retracted, repealed, or modified the limitations on taxable fees contained in [Sections 1821 and 1920]." *Crawford*, 107 S.Ct. at 2499. (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). I interpret this to mean that, as to § 1988, the limitations of § 1821 were repealed. Justice Blackmun's concurrence further supports this view. He stated:

> I join the Court's opinion and its judgment but upon the understanding that it does not reach the question whether, under 42 U.S.C. Section 1988, a district court may award fees for an expert witness.

107 S.Ct. at 2499.

While the third circuit has not specifically addressed the issue, most courts considering the issue have agreed that the legislative history of § 1988 shows that the statute was intended to permit reasonable costs, regardless of the limits of §§ 1821 or 1920. *See e.g. Roberts v. S.S. Kyriakoula D. Lemos*, 651 F.2d 201, 205 (3d Cir.1981) (reviews civil rights cases where expert witness fees were awarded "in part on the ground that the award helped effectuate Congress' intent to encourage initiation of civil rights actions."); *Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir.1983) ("Given the policy considerations underlying section 1988 and the legislative history, we agree with the other circuits that reimbursement of reasonable and necessary attorneys' expenses such as those involved here is allowable under the statute."); *Ramos v. Lamm*, 713 F.2d 546, 559 (10th Cir.1983) (expert witness fees compensable under Section 1988 and were not limited by 28 U.S.C. Section 1920); *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.1981) (Congress manifested intention that different rule from section 1821 be applied in civil rights litigation); *U.S. v. Yonkers Bd. of Educ.*, 118 F.R.D. 326, 330 (S.D.N.Y.

1987) (post *Crawford* case declining to impose Section 1821 ceiling in a 42 U.S.C. § 1988 case). Plaintiffs are thus entitled to an award of expert fees if they meet the requirements of *Roberts v. S.S. Kyrikoula D. Lemos,* 651 F.2d 201 (3d Cir.1981).

Under *Roberts,* plaintiffs must show that the use of the experts was "indispensable to the determination of the case" or "played a crucial role in the resolution of the issues presented." 651 F.2d at 206.

**(1)** *Drs. Brent Baxter and James Kirkpatrick*

■ Two of the experts in question, industrial psychologists Drs. Brent Baxter and James Kirkpatrick, were test validation authorities. Defendant argues that plaintiffs' experts were not "indispensable" because the provisions in the Consent Decree relating to testing were drafted by Joseph S. Hanson, Manager of the PECO personnel department, and his staff, in response to a request from plaintiffs' counsel in the course of the settlement proceedings. Hanson Aff., p. 1. Mr. Hanson stated that:

> the company never received any specific information as to possible testimony of witnesses Baxter and Kirkpatrick concerning test validation. The Company, in devising the testing provisions of the Consent Decree, gave no consideration at all to any possible impact at trial of testimony by these witnesses concerning test validation."

Hanson Aff., p. 2.

Plaintiffs argue that the expert testimony was essential to the plaintiffs' case and therefore essential to obtaining the relief embodied in the Consent Decree. Plaintiffs contend that PECO personnel's knowledge of the expert witnesses' possible testimony is irrelevant and that the issue is whether concerns about the "potentially damaging nature of such testimony led PECO's attorneys to settle the case." Plaintiffs' Reply Brief at 26. Plaintiffs' counsel stated:

> If plaintiffs had not had their experts listed on their pretrial statement and prepared and ready to testify at trial concerning PECO's tests, there would cer-

tainly have been no hope of securing any relief in the Consent Decree in plaintiffs' testing case.

Ballard Aff., p. 10. Defendant has not offered any rebuttal to this assertion.

I find that plaintiffs are entitled to recover expert fees for Drs. Baxter and Fitzgerald. Plaintiffs hired them to review the test validation studies performed by PECO. Ballard Aff., p. 10. Defendant's test validation studies would have been a major defense to plaintiffs' claims at trial. Plaintiffs were thus required to hire experts to counter defendant's studies. Whether plaintiff used these experts at trial or whether defendants used plaintiffs' experts' testimony in fashioning the remedy is not relevant. *See U.S. v. Yonkers,* 118 F.R.D. at 330. The issue is whether plaintiffs were required to hire such experts in order to attempt to construct a strong enough case to enable them to settle the case. I find that plaintiffs were so required and that their experts were therefore "indispensable."

**(2)** *Accountant Regan R. Rockhill*

■ Plaintiffs' third expert witness was Regan R. Rockhill, a certified public accountant, who is an expert in cost accounting. Plaintiffs contend that Rockhill was hired to give his opinion at the settlement approval hearing on the steps necessary for PECO to implement the provisions of the Consent Decree and the expense of such steps to the company. Mr. Newberg asserted that:

> counsel for the plaintiffs and the class felt that it would be very important to offer expert testimony on the scope of the complex Consent Decree provisions, in order to assist the court in evaluating the fairness and adequacy of the settlement to make the numerous objectors to the proposed settlement aware of the extensiveness of the changes required by the Consent Decree, and finally, to place on record what counsel for the class expected PECO to do in implementation of this Decree so that PECO would have an opportunity at the settlement hearing to

raise any specific objections it might have.

Reply Brief in Support of Joint Petition for Award of Reasonable Attorneys Fees and Costs (Original Fee Petition Reply), Ex. 2, Newberg Supp.Aff., p. 7. I agree. An expert's testimony and advice on such a complex settlement agreement is "indispensable" for the reasons in the above-cited quote.

## IV. FIRST FEE PETITION

■ Plaintiff and defendant agree that the first fee petition lodestar is $20,693, but disagree as to how the *Hensley* reducer is to be applied to this amount. Defendant argues that the lodestar must be reduced by comparing the amount of this court's ultimate fee award to the amount in plaintiffs' original fee request and then using the percentage difference between the two as the *Hensley* reducer to plaintiffs' fee petition lodestar. Plaintiffs argue that defendant's formula is inappropriately strict under *Hensley*. They contend that, because the issues contained in the higher fee petition are inextricably linked to those contained in the lower award, *Hensley* does not require a reduction. They further argue that plaintiffs' attorneys should not be penalized for requesting the highest reasonable fee award if the court should decide to allow a somewhat lower award.

The court in *Institutionalized Juveniles* held that counsel fees for litigating fee petitions should be liable to reduction by use of the methods set out in *Hensley*. The district court has "discretion to decide whether it is proper to adjust the lodestar by a general reduction of the lodestar, by the complete disallowance of hours spent litigating wholly unsuccessful claims, or by use of both methods." 758 F.2d at 925. The court must consider, however, the degree of relatedness between claims on which the plaintiffs were successful, and claims on which they were wholly unsuccessful. Failure to consider this relatedness would constitute an abuse of discretion. 758 F.2d at 924–925.

Defendant's proposed calculation of the *Hensley* reducer is not acceptable. It is not in keeping with the methodology outlined in *Institutionalized Juveniles*, nor does it take the interrelatedness of claims into account.

Plaintiffs requested a basic lodestar of $537,499.00. This court disallowed a total of 491.70 hours spent by plaintiffs' counsel in preparing for an NLRB proceeding, two temporary restraining orders, and a final pretrial memorandum. These were wholly unsuccessful claims and, to the extent that plaintiffs' counsel sought an award of these claims in the fee petition, it was partially unsuccessful.

Plaintiffs' counsel also sought enhancement of the basic lodestar on the grounds of (1) quality of work, (2) contingency factors, and (3) delay. Plaintiffs were unsuccessful in their claim for a quality enhancement because consideration of this factor was ruled out by the Supreme Court in *Delaware Valley II.* I will not penalize plaintiffs for a claim which was unsuccessful due to a change in the law of attorneys' fees. Plaintiffs were successful in their pursuit of enhancers for contingency and delay. Although they may not have received the exact amount they requested, they did prevail and did not waste the court's time on these issues. Therefore, I will not reduce the plaintiffs' fee petition on the issue of lodestar enhancement.

Plaintiffs' lodestar claims constituted approximately one-third of the original fee petition. I find that the lodestar claims were 30% unsuccessful and I will therefore reduce the $20,693.00 spent on the fee petition by 11% (one-third times 30% reduction).

## V. POST–JUDGMENT INTEREST

■ Plaintiffs ask for post-judgment interest on the award under 28 U.S.C. § 1961 for the period from 1985 to the present. In making this request, plaintiffs rely on the third circuit's distinction in this case between a delay enhancer award and post-judgment interest. *BGC,* 802 F.2d at 655–56.

Defendant argues that plaintiffs are not entitled to post-judgment interest on the grounds that section 1961 does not apply

where the original judgment for attorneys' fees was vacated by the court of appeals.

Section 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." The question of whether post-judgment should be awarded where a case is remanded was addressed in *Institutionalized Juveniles*. The third circuit held there that, on remand, the district court should allow post-judgment interest on the amount of the recalculated award from the date of its original order allowing the award. 758 F.2d at 927.

Defendant argues that the present case differs from *Institutionalized Juveniles* because the district court fee award was vacated only in part in that case, while it was vacated in its entirety in the case at hand. Defendant's argument is a specious one. The appellate court in *Institutionalized Juveniles* vacated the *judgment* of the district court in part, and remanded for recalculation of the fee award. The appellate court in *BGC* vacated this court's *fee award* but affirmed the court's judgment on several issues. 802 F.2d at 657. The situation in the two cases is thus identical. Both courts vacated the district court's judgment in part, and both courts remanded for recalculation of the fee awards,

thereby vacating the district courts' original fee award.

Therefore, post-judgment interest will be awarded as instructed in *Institutionalized Juveniles*. It will be calculated on the present award and paid from the date of the original fee award.

## VI. INTERIM FEE AWARD

 Plaintiffs' counsel requests an interim fee award of the "uncontestable portion of the fees to which plaintiffs are now entitled." Plaintiffs' Petition at 59. While it is true that courts may make interim fee awards in appropriate circumstances, I do not believe this to be such a circumstance. *See e.g. Parker v. Lewis*, 670 F.2d 249 (D.C.Cir.1982); *Fadhl v. City and County of San Francisco*, 804 F.2d 1097 (9th Cir. 1986). It is not practical to attempt to determine the minimum fee to which plaintiffs are entitled. I have recalculated the entire award—including the *Hensley* reducer, the contingency enhancer, the delay enhancer, the costs of the first fee petition, the expert witness costs, and the post-judgment interest. None of these calculations is "uncontestable." Therefore, I decline to award interim fees.

### TABLE 1—RECALCULATION OF LODESTAR ON ANNUAL BASIS

Newberg

| Year | Newberg Hours (rounded) | Rates | Annual Newberg Lodestar |
|---|---|---|---|
| 4/75–12/75 | 15 | 135 | 2,025 |
| 1976 | 347 | 135 | 46,845 |
| 1977 | 93 | 135 | 12,555 |
| 1/78–8/78 | 41 | 135 | 5,535 |
| 9/78–12/78 | 116 | 150 | 17,400 |
| 1978 Total | | | 22,935 |
| 1979 | 105 | 150 | 15,750 |
| 1/80–8/80 | 75 | 150 | 11,250 |
| 9/80–12/80 | 44 | 175 | 7,700 |
| 1980 Total | | | 18,950 |
| 1981 | 79 | 175 | 13,825 |
| 1982 | 31 | 175 | 5,425 |
| 1983 | 185 | 175 | 32,375 |
| 1984 | 42 | 225 | 9,450 |
| 1/85–2/28/85 | 4 | 225 | 900 |
| TOTAL | 1177 hours | | 181,135 |

Ballard

| Year | Hours (rounded) | Rates | Lodestar |
|---|---|---|---|
| 1979 | 63 | 90 | 5,670 |
| 1980 | 101 | 90 | 9,090 |
| 1981 | 199 | 90 | 17,910 |
| 1982 | 44 | 90 | 3,960 |
| 1983 | 201 | 125 | 25,125 |
| 1/84–7/84 | 59 | 125 | 7,375 |
| 8/84–12/84 | 3 | 150 | 450 |
| 1984 Total | | | 7,825 |
| 1985 | 22 | 150 | 3,300 |
| TOTAL | | | 72,880 |

Fuoco

| Year | Hours | Rates | Lodestar (rounded) |
|---|---|---|---|
| 1975 | 12.75 | 65 | 829 |
| 1976 | 93.5 | 75 | 7,013 |
| 1977 | 46.5 | 75 | 3,488 |
| 1978 | 9.5 | 85 | 808 |
| TOTAL | | | 12,138 |

Trent

| Year | Hours (rounded) | Rates | Lodestar |
|---|---|---|---|
| 1979 | 58 | 100 | 5,800 |
| 1980 | 95 | 100 | 9,500 |
| 1981 | 7 | 115 | 805 |
| 1982 | 3 | 115 | 345 |
| 1983 | 22 | 125 | 2,750 |
| TOTAL | | | 19,200 |

TOTALS

| Year | Newberg | Ballard | Fuoco | Trent | Total: All Attorneys |
|---|---|---|---|---|---|
| 1975 | 2,025[2] | | 829 | | 2,854 |
| 1976 | 46,845 | | 7,013 | | 53,858 |
| 1977 | 12,555 | | 3,488 | | 16,043 |
| 1978 | 22,935 | | 808 | | 23,743 |
| 1979 | 15,750 | 5,670 | | 5,800 | 27,220 |
| 1980 | 18,950 | 9,090 | | 9,500 | 37,540 |
| 1981 | 13,825 | 17,910 | | 805 | 32,540 |
| 1982 | 5,425 | 3,960 | | 345 | 9,730 |
| 1983 | 32,375 | 25,125 | | 2,750 | 60,250 |
| 1984 | 9,450 | 7,825 | | | 17,275 |
| 1985 | 900 | 3,300 | | | 4,200 |
| TOTAL | 181,035 | 72,880 | 12,138 | 19,200 | 285,253 |

Newberg Associates Lodestar — 8,475

$293,728

2. This court's original determination of Mr. Newberg's and Mr. Trent's hours were not made on an annual basis. These numbers, which are divided on an annual basis, do not coincide precisely with this court's original calculations. This slight difference is required, however, because the delay enhancer must be calculated on an annual basis. The difference is only $10, an amount which I find to be negligible.

## TABLE 2—LODESTAR ADJUSTMENTS

| Year | Lodestar All Attorneys | Hensley Reducer | 200% Contingency Enhancer |
|---|---|---|---|
| 1975 | 2,854 | 714 | 2,142 |
| 1976 | 53,858 | 13,465 | 40,395 |
| 1977 | 16,043 | 4,011 | 12,033 |
| 1978 | 23,743 | 5,936 | 17,808 |
| 1979 | 27,220 | 6,805 | 20,415 |
| 1980 | 37,540 | 9,385 | 28,155 |
| 1981 | 32,540 | 8,135 | 24,405 |
| 1982 | 9,730 | 2,433 | 7,299 |
| 1983 | 60,250 | 15,063 | 45,189 |
| 1984 | 17,275 | 4,319 | 12,957 |
| 1985 | 4,200 | 1,050 | 3,150 |

## TABLE 3—LODESTAR ADJUSTED FOR DELAY

### Annual Compound Interest Amount

| YEAR | LODESTAR | MEDIAN INTEREST RATE | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | YEARLY TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1975 | 2142 | 7.6% | 81.40 | 150.30 | 160.22 | 223.49 | 324 27 | 475.81 | 694.42 | 680.73 | 539.63 | 665 43 | 591.67 | 4587.37 |
| 1976 | 40395 | 6.76% | — | 1365.35 | 2818.82 | 3931.88 | 5704.90 | 8370.94 | 12216.96 | 11976.10 | 9493.73 | 11706 88 | 10409.33 | 77994.89 |
| 1977 | 12033 | 6.75% | — | — | 406.11 | 1097.13 | 1591.86 | 2335.78 | 3408.95 | 3341 74 | 2649 07 | 3266.62 | 2904.55 | 21001.81 |
| 1978 | 17808 | 8.82% | — | — | — | 785.33 | 2186.58 | 3208.42 | 4682 52 | 4590.20 | 3638.76 | 4487.02 | 3989.69 | 27568.52 |
| 1979 | 20415 | 11.76% | — | — | — | — | 1200.40 | 3337.42 | 4870.79 | 4774 76 | 3785.06 | 4667.43 | 4150.10 | 26785.96 |
| 1980 | 28155 | 15.44% | — | — | — | — | — | 2173.57 | 5920.14 | 5803.42 | 4600.50 | 5672.96 | 5044.19 | 29214.78 |
| 1981 | 24405 | 19.52% | — | — | — | — | — | — | 2381.93 | 4288.59 | 3399.66 | 4192.18 | 3727.53 | 17989.89 |
| 1982 | 7299 | 16.01% | — | — | — | — | — | — | — | 584.28 | 862 43 | 1063.48 | 945.61 | 3455.80 |
| 1983 | 45189 | 10.94% | — | — | — | — | — | — | — | — | 2471.84 | 5795 56 | 5153.20 | 13420.60 |
| 1984 | 12957 | 12.16% | — | — | — | — | — | — | — | — | — | 787.79 | 1325.00 | 2112.79 |
| 1985 | 3150 | 9.64% | — | — | — | — | — | — | — | — | — | — | 151.83 | 151.83 |
| | | | | | | | | | | | | | | 224,284.24 |

NOTE· The annual interest amount for the year in which the lodestar arose has been divided in half to adjust for the assumption that the lodestar was earned ratably throughout the year.

## TABLE 4—SUMMARY OF PLAINTIFFS' FEE AWARD

| | |
|---|---|
| Total Adjusted Lodestar | $213,948.00 |
| Compounded Interest | 224,284.24 |
| First Fee Petition ($20,692.50) (Reduced by 11%) | 18,416.33 |
| Expert Witness Fee | 13,219.30 |
| Uncontested Costs | $ 30,527.13 |
| Total | 500,395.00 |

Post-judgment interest is to be calculated on $500,395.00 dating from August 13, 1985.