Robert J. McDONNELL, Plaintiff,

v.

UNITED STATES of America,
et al., Defendants.

Civ. A. No. 88–3682 (AET).

United States District Court,
D. New Jersey.

Nov. 9, 1994.

Joseph Hillman, Jr., Belmar, NJ, for plaintiff, Robert J. McDonnell.

Betty E. Uhrmacher, Asst. U.S. Atty., Trenton, NJ, for defendant, U.S.

## OPINION

WOLFSON, United States Magistrate ·Judge.

Presently before the Court is the motion by Robert J. McDonnell, plaintiff, seeking attorney fees incurred as a result of his Freedom of Information Act (FOIA) litigation against defendants, United States of America, Department of the Navy and Department of Justice. The Court has received opposition from the defendants, as well as a reply by McDonnell. This Court enters judgment in this matter pursuant to 28 U.S.C. § 636, with the parties having consented to this Court's jurisdiction.

### Background

With the close of this six-year litigation drawing near, plaintiff is now seeking an order awarding him attorney fees in the amount of $55,193.00. *Certification of Plaintiff's Attorney*. Without repeating all of the facts and arguments of the underlying litigation in full detail [1], this Court must review plaintiff's claims, in particular his relative successes, in order to properly consider this application.

In June 1985, McDonnell and Frederick N. Rasmussen,[2] venturing to co-author a scholarly book about the September 8, 1934 fire aboard the Morro Castle Luxury Liner, filed a FOIA request seeking various records relating to the occurrence. Specifically, McDonnell requested records pertaining to George White Rogers, George Alagna, John B. Duffy, the Morro Castle and the "Black

Tom" explosion from the Office of Congressional and Public Affairs.

On March 24, 1986, the FBI released only 666 of 1,029 pages relevant to McDonnell's request, claiming the unreleased documents were exempt from disclosure. The FBI subsequently provided some additional documents regarding the Morro Castle and George White Rogers. On July 14, 1986, the Office of Information and Privacy (OIP) denied McDonnell's appeal, but advised him that some additional records pertaining to deceased individuals would be released. The FBI then released some additional documents regarding Rogers, and McDonnell appealed its withholding of the remaining records pertaining to Rogers. The OIP also denied this appeal, and advised McDonnell that the FBI would not release information regarding Alagna without proof of his death.

During its search, the FBI also located three Navy documents, and forwarded two of them to the Navy Military Personnel Command (NMPC) and the other to the Naval Investigative Service Command (NISCOM). NMPC released unredacted copies of the first two documents and NISCOM released a deleted copy of its document to McDonnell, claiming the deletion was necessary to avoid an unwarranted intrusion upon personal privacy. 5 U.S.C. § 552(b)(7)(C). McDonnell unsuccessfully appealed this decision to the Secretary of the Navy. In 1987, he made a new request to NISCOM for information pertaining to Rogers, Duffy, and Admiral W.F. Halsey. NISCOM located no relevant documents; furthermore, the request was not forwarded to other divisions of the Department of Navy because McDonnell had not requested this action.

On August 22, 1988, McDonnell and Rasmussen filed a complaint in federal district court seeking disclosure of the information withheld by the Government, including specifically: the Navy records of George White Rogers; the Navy records regarding "the outcome of the [Oscar] Niger investigation;

---

1. A more detailed presentation of facts and arguments appears in both the Magistrate's Report and Recommendation, entered on June 10, 1991, and the opinion of the Third Circuit on appeal. See *McDonnell v. United States*, 4 F.3d 1227 (3d Cir.1993).

2. The Magistrate's Report and Recommendation concluded that Rasmussen lacked standing and the Third Circuit affirmed; consequently, Rasmussen is not involved with this motion.

information pertaining to Niger; a threatening letter allegedly written by Rogers to Admiral Halsey; information withheld by the FBI relating to Alagna, Duffy, the Morro Castle, and the "Black Tom" file; and clearer copies of documents which McDonnell claimed were illegible.

In January 1989, plaintiffs filed a motion for an *in camera* inspection of the documents sought in the complaint.[3] On March 13, 1989, the government filed its *Vaughn* index, which included declarations of FBI Special Agent ("SA") William Earl Whaley and SA Angus Llewellyn relating to the documents withheld by the FBI, the declaration of Lieutenant Commander Brian D. Robertson of the Judge Advocate General's Corps regarding the documents forwarded by the FBI to NISCOM, and two affidavits by Jacqueline D. Marini, Assistant Information and Privacy Coordinator, NISCOM, regarding the document forwarded by the FBI to NISCOM.

On July 25, 1989, McDonnell filed an affidavit in response, and, on August 31, 1989, he moved for summary judgment and renewed his motion for an *in camera* review. On October 26, 1989, the Government filed a cross-motion for summary judgment, supplementing it with the Second Declaration of SA Llewellyn. This Court heard oral argument on July 16, 1990, and directed the government to submit an affidavit regarding the FBI's interviewing techniques, specifically including whether interviewees were expressly or impliedly assured confidentiality, along with both an *ex parte* affidavit and *in camera* inspection of the materials produced to the grand jury which investigated the Morro Castle incident.

On June 7, 1991, this Court filed a Report and Recommendation ("*Report*") which concluded, *inter alia:*

1. Certain requests for records pertaining to Alagna, Duffy, and the "Black Tom" explosion and documents relating to Niger were properly denied because plaintiffs failed to exhaust administrative remedies. *Report,* pp. 11–16.

2. NISCOM conducted a proper search, and was not obligated to forward McDonnell's request to other departments within the Navy. *Id.* at 17–18.

3. The withholding of five documents which related to FBI cryptographic systems was proper because they related to national security. *Id.* at 18–24. *See* 5 U.S.C. § 552(b)(1).

4. The withholding of the grand jury records is required by *Fed.R.Crim.P.* 6(e). *Report,* at 24–27. *See* 5 U.S.C. § 552(b)(3).

5. The withholding of Rogers' juvenile records is also authorized by federal law. *Report,* at 27–29. *See* 5 U.S.C. § 552(b)(3); 18 U.S.C. § 5038.

6. The withholding of medical information located in a personnel record of an undisclosed individual was proper because the privacy interests implicated outweighed the public benefits of disclosure. *Report,* at 29–32. *See* 5 U.S.C. § 552(b)(6).

7. The withholding of records compiled for law enforcement purposes, including the identities and information which would identify certain FBI agents and personnel, law enforcement officers, non-FBI federal government employees, individuals mentioned in FBI files, and individuals who are the subjects of other FBI investigations or third parties in whom the FBI had an interest, was proper because disclosure would constitute an unwarranted intrusion upon personal privacy. *Report,* at 33–37, 40–41. *See* 5 U.S.C. § 552(b)(7)(C).

8. The withholding of records compiled for law enforcement purposes was improper as it related to the following information:

—the identities of any deceased persons, *Report,* at 37–39

—the identities of witnesses and other third parties whom the FBI interviewed in connection with its investigations, *Id.* at 39–40

9. The withholding of records compiled for law enforcement purposes which alleg-

---

**3.** United States Magistrate Judge John W. Devine denied the motion without prejudice because the government had not yet submitted its *Vaughn* index, specifying the government's claimed ex-

emptions for the withheld documents. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

edly identified two FBI confidential sources was proper for two persons who had been given express assurances of confidentiality, but the withholding of the records of other sources whom the FBI claimed were given implicit assurances of confidentiality was improper. *Id.* at 41–47. *See* 5 U.S.C. § 552(b)(7)(C), (b)(7)(D).

10. The withholding of records compiled for law enforcement purposes which would allegedly disclose techniques and procedures for law enforcement investigations or prosecutions was proper. *Report,* at 47–48. *See* 5 U.S.C. § 552(b)(7)(E).

On September 11, 1991, the district court adopted the Report and Recommendation "in its entirety." On appeal, the Third Circuit affirmed most of the district court's order, specifically holding, *inter alia:* Rasmussen did not have standing, *McDonnell v. United States,* 4 F.3d 1227, 1236–39 (3d Cir.1993); McDonnell's failure to exhaust administrative remedies precluded consideration of certain claims, *id.* at 1239–41; the government properly withheld the documents which pertained to national security, *id.* at 1242–46; the government properly withheld the records regarding the grand jury proceedings, *id.* at 1246–49; the government properly withheld the records compiled for law enforcement purposes and intruded upon personal privacy, *id.* at 1254–56; and the government properly withheld information regarding witnesses who had received express assurances of confidentiality. *Id.* at 1257–58. The court reversed the portion of the district court's order which permitted the government to withhold Rogers' juvenile records, *id.* at 1249–51, as well as the portion which authorized the release of the names and personal information of witnesses and third parties interviewed which could constitute an unwarranted invasion upon their privacy. *Id.* at 1256–57. The Third Circuit remanded the issue of the medical records in the undisclosed person's files for a determination of whether that person was alive, *id.* at 1251–54, and vacated and remanded the claims involving the implied assurances of confidentiality in light of the recent Supreme Court decision in *United States Dept. of Justice v. Landano,* — U.S. ——, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). *McDonnell,* 4 F.3d at 1258–60. Finally, the Third Circuit opined that McDonnell was entitled to receive "the best possible reproductions of the documents to which he is entitled"; if legible copies could not be made, then "arrangements could be made to have redacted transcripts prepared by a transcriber with appropriate security clearance." *Id.* at 1261–62 n. 21.

### Discussion

 The Freedom of Information Act provides: "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E). It is well established that a plaintiff can recover attorney fees only if 1) he is eligible, and 2) he is entitled to such an award. *See e.g. Landano v. U.S. Dept. of Justice,* 873 F.Supp. 884 (D.N.J. 1994).

 In order to be considered eligible for attorney fees, a plaintiff must have substantially prevailed in his action. 5 U.S.C. § 552(a)(4)(E). A plaintiff has substantially prevailed if 1) his lawsuit was reasonably necessary for the records sought to be disclosed, and 2) the litigation substantially caused the release of these records. *Chesapeake Bay Foundation, Inc. v. U.S. Dept. of Agriculture,* 11 F.3d 211, 216 (D.C.Cir.1993), *reh'g denied; Vermont Low Income Advocacy Council, Inc. v. Usery,* 546 F.2d 509, 513 (2d Cir.1976).

 If the plaintiff has established his eligibility, the court then has discretion as to whether or not to award fees. Although not strictly limited, courts primarily consider four factors in making this determination: public benefit resulting from the disclosure, commercial benefit to plaintiff resulting from the disclosure, the nature of plaintiff's interest in the records disclosed, and whether the government had a reasonable basis in law for withholding the records. *Chesapeake Bay Foundation,* 11 F.3d at 216. A plaintiff must establish that consideration of these factors, taken as a whole, favors recovery.

■ Finally, if the plaintiff has established both eligibility for and entitlement to attorney fees, the Court must determine what amount of fees should reasonably be awarded, including any modification of the fee application. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

## 1. Is plaintiff eligible for attorney fees?

### a. *Did plaintiff prevail?*

■ The two-prong test for determining if a plaintiff substantially prevailed necessarily requires this Court in the first instance to determine whether plaintiff, in fact, has prevailed. The inquiry focuses on the information released as a result of the plaintiff having filed his complaint; the records need not necessarily have been released as a result of a court order for the plaintiff to have prevailed. *Miller v. U.S. Dept. of State,* 779 F.2d 1378, 1389 (8th Cir.1985), *reh'g denied; Westinghouse Electric Corp. v. NLRB,* 497 F.Supp. 82, 83 (W.D.Pa.1980). The plaintiff must generally establish that "but for the plaintiff's persistent presentation of his claim he would not have received the documents which he did." *Miller,* 779 F.2d at 1388. The Court must take into account "both the substance and the quality" of the records released in making this determination. *Union of Concerned Scientists v. U.S. Nuclear Regulatory Comm.,* 824 F.2d 1219, 1226 (D.C.Cir.1987). While plaintiff need not have achieved success on all of his claims to recover, attorney's fees may not be recovered if the compelled disclosure is only of "minimal significance." *Braintree Elec. Light Dept. v. Department of Energy,* 494 F.Supp. 287, 291 (D.D.C.1980).

■ Plaintiff argues first that he substantially prevailed because he was given better copies of a substantial number of illegible documents, while establishing the precedent that the government is "obligated to produce the 'best copies available'," and cannot use its "invalid defense" in the future. *Plaintiff's brief,* p. 5. Plaintiff notes that the government had initially denied him access, and later agreed to permit legible copies of only 50 pages or less of the illegible documents. *McDonnell affidavit,* ¶ 12, at 15.

Second, plaintiff argues that he received documents previously withheld based on the alleged implied confidentiality of FBI sources, and that his victory was one reason why the government ultimately changed its disclosure policy regarding the confidential source exemption. *Plaintiff's brief,* pp. 5–6. He claims that his success on this claim "resulted in the release of substantial information consisting of matters related to the grand jury investigation immediately after the disaster and of statements taken by eye witnesses." *Id.* at 6.

Finally, plaintiff notes his success in obtaining the release of Rogers' juvenile records, as well as the release of the names and material relating to deceased persons. *Id.* at 2.

In summary, plaintiff contends he received "242 complete pages of material" excluding "information previously withheld in the form of partially redacted information, or the over 100 illegible pages released or submitted as part of the Vaughn index." *Plaintiff's reply,* p. 1. These documents include "146 pages of eye witness statements taken from passengers shortly after the Morro Castle disaster," which include the conduct of the crew and the circumstances surrounding the death of the captain. *Id.* at 1–2. Plaintiff also notes that he received 1,744 new pages of documents produced voluntarily by the FBI, which were apparently not located until the FBI did an additional search after McDonnell's appeal to the Third Circuit. *McDonnell affidavit,* ¶ 19, at 4. McDonnell contends that his legal arguments against the government's use of certain exemptions would have been stronger had he had access to these belatedly released documents. *Id.,* ¶ 32, at p. 8. Finally, he concludes that the information provided to him after he commenced this lawsuit has enabled him to establish or verify numerous theories for his book. *See id.* at 11–20.

The Government characterizes McDonnell's success differently. First, it contends that "the Third Circuit rejected virtually every argument made by McDonnell on appeal." *Opposition brief,* p. 4. It also claims that the Third Circuit awarded McDonnell

only 1) the disclosure of one person's name after it was determined the person was deceased, and 2) 10 pages of George White Rogers' juvenile records. *Id.* The Government thus argues: "Petitioner's 'success' in court consists therefore of obtaining a single name and a few paragraphs of previously withheld information while otherwise losing on every substantive issue litigated." *Id.* at 4–5. The Government concludes that "the balance of the 'victory' claimed by plaintiffs is attributable to events and decisions unrelated to his FOIA suit.". *Id.* at 5.

Without yet addressing whether McDonnell's litigation was reasonably necessary for, or substantially caused, the release of the previously withheld documents, the Court notes that McDonnell did in fact achieve considerable success subsequent to the filing of his complaint. Plaintiff received Rogers' juvenile records and the name of the person determined to be deceased. He also received 10 pages of previously withheld material addressing the names of individuals determined to be deceased. *Moran affidavit,* pp. 2–3. In addition, McDonnell did not obtain legible copies of a substantial number of documents until vigorously pursuing this matter in litigation. But perhaps most significantly, after the Supreme Court decision in *Landano* was handed down, the FBI also released 76 pages of material previously withheld along with portions of another 146 pages. *Id.* at 2. Finally, as noted above, he also received several hundreds of additional documents discovered as the result of an additional FBI search.

Plaintiff has stated that the information obtained through the above disclosure has resulted in the development of new theories and verification of others, which, of course, furthered his objective in commencing this litigation. For example, McDonnell asserts: "In combination with legible copies, I consider the lifting of the above named exemptions as revealing of data which helps change *all* historical accounts of the Morro Castle disaster and George White Rogers' role in it; that is, the supposition that Rogers' killed the Morro Castle's Captain, Robert R. Willmott, and then set fire to the vessel because he was to be fired when the ship reached New York." *McDonnell affidavit,* ¶ 45, at 15. McDonnell then sets forth the documents released which, he contends, helped him to support this thesis.

Without delving into the merits of McDonnell's theories and allegations regarding the Morro Castle incident, this Court concludes as a preliminary matter that McDonnell's success was significant enough to support some recovery of attorney fees. *Compare Des Moines Register and Tribune Co. v. Dept. of Justice,* 563 F.Supp. 82 (D.D.C.1983) (recovery of 51 pages of documents considered substantial). Accordingly, the Court will now address whether the litigation was necessary to obtain his success, and whether the action substantially caused the disclosures.

### b. *Was plaintiff's action reasonably necessary to obtain the withheld documents?*

The Court must next consider whether litigation was reasonably necessary for plaintiff to obtain the withheld documents noted above.

■ First, the juvenile records of George White Rogers and the name of the deceased person were ordered disclosed by the Third Circuit. Furthermore, both this Court and the Third Circuit required the FBI to disclose any requested information regarding deceased persons which was being withheld strictly based on the personal privacy exceptions. Accordingly, the disclosure of the juvenile records, the deceased person's identity and the 10 pages of new information regarding deceased persons would not have occurred had plaintiff not instituted his complaint.

■ Second, the history of this litigation supports plaintiff's contention that he would not have had access to legible copies of numerous documents had he not filed suit. Upon receiving documents from the FBI, plaintiff informed the agency that a substantial number of these documents were illegible, a finding confirmed by this Court. *Report,* at 10. Plaintiff contends that at least 100 pages of documents were effectively withheld because of the illegibility of the

copies he received. *Plaintiff's reply,* at p. 6. In response, S.A. Angus B. Llewellyn offered McDonnell a maximum of 50 "cut out" thermal slicks. *First Llewellyn declaration,* ¶ 12, at 3. Had plaintiff not instituted this action, he would otherwise not have been able to review the documents in question, notwithstanding the apparent fact that the Government had been able to do so. *See McDonnell affidavit,* ¶ 14 at 3 ("I believe sound reasoning dictates that someone at FBIHQ had to be able to read the documents before redacting them.") Accordingly, the institution of this action was reasonably necessary in order for plaintiff to achieve this result.

■ Third, it is also apparent that McDonnell would not have received the 76 pages and 146 partial pages of documents containing witness statements without filing suit. At the time McDonnell filed his complaint, the Government steadfastly maintained that it had the right to withhold documents which contained witness statements by simply asserting that the statements had been procured on the basis of either express or implied assurances of confidentiality.

McDonnell's claim regarding the implied confidentiality exemption was heard by this Court prior to the Third Circuit decision in *Landano, see Landano v. U.S. Dept. of Justice,* 956 F.2d 422 (3d Cir.1992), which was later modified by the Supreme Court. The Government, relying on the recent decision in *Dow Jones & Co., Inc. v. Department of Justice,* 917 F.2d 571 (D.C.Cir.1990), took the position that the mere fact that a witness statement was solicited during the course of an FBI investigation raises a presumption it was given in exchange for an implied assurance of confidentiality. *Report and Recommendation,* at 46, *citing Dow Jones,* 917 F.2d at 576. Since *Landano* had not yet been decided by the Third Circuit, and since no other Third Circuit case had addressed the *Dow Jones* holding at that time, this Court refused to adopt the strict standard suggested by the Government, and found that the Government failed to produce evidence supporting its contention of implied assurances of confidentiality. *Report and Recommendation,* at 46; *See McDonnell,* 4 F.3d at 1259.

Subsequent to this Court's ruling, the Third Circuit agreed that such a presumption of confidentiality was not appropriate. *Landano v. U.S. Dept. of Justice,* 956 F.2d 422, 432–33 (3d Cir.1992), vacated in part and remanded, — U.S. —, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993).

The Supreme Court ultimately held that such statements enjoy no presumption of confidentiality, and should only be considered confidential if the witness had the understanding that the government's release of this information would be strictly limited to the extent required by law enforcement needs. *United States Dept. of Justice v. Landano,* — U.S. at — – —, 113 S.Ct. at 2019–20. Applying this holding, the Third Circuit vacated and remanded the district court order, *McDonnell,* 4 F.3d at 1260, and the Government ultimately provided McDonnell with the previously withheld documents.

The Government did not retreat from its position until the Supreme Court's *Landano* decision forced it to do so. At the time McDonnell filed his complaint, neither the Third Circuit nor the Supreme Court had decided *Landano,* and there was no reason for McDonnell to believe he would be able to rely on a subsequent holding in that case to obtain the information without filing suit; it was not until 1992, four years after McDonnell instituted this action, that the Third Circuit held that the Government's presumption was improper. Even at this point, the Government did not accept this conclusion, and appealed to the Supreme Court. *See Landano,* 956 F.2d at 452 ("[The FBI] cites cases from no less than six courts of appeals for the proposition that 'promises of confidentiality are inherently implicit in FBI interviews conducted pursuant to a criminal investigation.' (citations omitted).")

The fact that the Third Circuit decided *Landano* before *McDonnell,* which ultimately resulted in *Landano* being the decision containing the Supreme Court's holding on the issue of implied confidentiality, is strictly a fortuitous result of timing, and cannot now be employed as a basis for finding that McDonnell did not prevail on the issue and, accordingly, should not receive attorney's fees. McDonnell raised the exact same issue

presented in *Landano* and argued it before this Court prior to either the Third Circuit or Supreme Court decisions in that case. . This Court accepted McDonnell's argument prior to either *Landano* decision, and, based upon the *Landano* Supreme Court decision, the Third Circuit ultimately accepted the argument set forth by McDonnell, albeit through the *Landano* holding.

In summary, at the time he filed his complaint in 1988, McDonnell had every reason to believe that his litigation was necessary in order to compel the Government to release the documents withheld pursuant to "implied confidentiality." To deny McDonnell his victory would require a determination that McDonnell should have foreseen the results of the *Landano* litigation four years later, while also assuming that the Third Circuit would reject the holdings of six other circuits. Accordingly, this Court finds that plaintiff's litigation was reasonably necessary in order to receive the witness statements previously withheld by the FBI.

Not only is the Court satisfied that plaintiff received substantial information only as a result of filing suit, it also notes that plaintiff may not have received the additional 1744 pages of new information released by the FBI in 1992 but for this lawsuit. This information was not provided until four years after plaintiff's complaint, and six years after his initial request. While this Court does not have before it sufficient evidence to determine why the documents were released so late in the process, it notes that plaintiff reasonably argues that the initial searches were "inadequate and deficient," and further that these documents probably would not have been located had plaintiff declined the option to litigate four years earlier.

### c. Did the filing of this action substantially cause the withheld documents to be released?

 The Government contends that even if plaintiff's litigation was reasonably necessary in order to obtain the withheld documents, the litigation itself did not cause the documents to be released. For much of the same reasons noted above, the Court cannot accept this argument.

The Government contends that the disclosure which plaintiff received was caused by three factors:

> (1) a change in the internal FOIA policies of the Department of Justice; (2) a change in the law surrounding FOIA Exemptions b(7)(C) and b(7)(D) resulting from the Supreme Court's ruling in *U.S. Dept. of Justice v. Landano*, [—— U.S. ——, 113 S.Ct. 2014 [124 L.Ed.2d 84] (1993); and (3) an agreement made by the parties on October 25, 1993 independent of the FOIA suit.

*Opposition brief,* at p. 6.

First, as addressed earlier, the *Landano* holding regarding implied confidentiality might have been presented in the instant case but for the skewed timing of these cases. This Court will not penalize plaintiff for the simple fact that the *Landano* case moved through the court system first.

Regarding the change of Justice Department policies, it must be noted that even if the Government would not have released the documents but for the change of policy, the release also would not have happened had McDonnell not filed suit. This policy change did not occur until 1993, more than five years after McDonnell filed his complaint. The bottom line is that if McDonnell had not filed a complaint in 1988 and instead given up his pursuit of these documents, then he would not have received the documents released after the recent change of policy.

Finally, the argument that portions of 146 pages of information were released as a result of an October 25, 1993 agreement between the parties may be formalistically correct, but this agreement was substantially caused by the legal proceedings. The agreement provided for the release of "information previously withheld under Exemption b(7)(D)." *Moran Declaration,* at 2–3. The agreement was reached because *Landano* required the Government to reconsider its policies regarding this exemption, and the Third Circuit in this case remanded for that same purpose. As noted above, plaintiff's argument in *Landano* was the same as McDonnell's position. The argument regarding the Exemption b(7)(D) raised by plaintiffs in both *McDonnell* and *Landano* was the basis

for the October 25, 1993 agreement, and, as noted above, McDonnell should not be penalized for the circumstances which resulted in the *Landano* case proceeding more quickly.

This Court finds that McDonnell's litigation substantially caused the release of not only Rogers' juvenile records, the name of the person determined to be deceased, and the 10 pages of previously withheld information addressing the names of individuals determined to be deceased, but also the more legible copies and the material previously withheld pursuant to Exemption b(7)(D).

**2. Is plaintiff entitled to attorney fees?**

Having found that plaintiff is eligible for attorney fees, this Court will now analyze the four discretionary factors and determine whether he is, in fact, entitled to such an award.

 The first factor addresses whether the public benefitted from the disclosure of the information in question. The Court finds that the public has benefitted in at least two ways from this disclosure. First, the public benefits from disclosure to those "who seek to shed light on the actions of the government and the underlying circumstances of newsworthy events." *Miller v. U.S. Dept. of State*, 779 F.2d 1378, 1389–90 (8th Cir.1985) (1967 Israeli attack on U.S.S. Liberty), *reh'g denied*. A FOIA request resulting in disclosure which has "historical significance" will be deemed to benefit the public. *Diamond v. F.B.I.*, 532 F.Supp. 216, 234 (S.D.N.Y.1981) (government surveillance involving Sen. Joseph McCarthy), *aff'd* 707 F.2d 75 (2nd Cir.1983), *cert. den.* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984). *See also Katz v. Webster*, 1987 WL 11563 (S.D.N.Y.1987), at 2 (McCarthy investigations); *Weisberg v. U.S. Dept. of Justice*, 1987 WL 11984 (D.D.C.1987) (Martin Luther King, Jr. assassination). In addition, information concerning an FBI investigation of an individual "adds important knowledge to the public domain, and adds to the collective knowledge of our society and the Government's activity in it." *Katz v. Dept. of Justice*, 498 F.Supp. 177 (S.D.N.Y.1979). For example, one court noted:

These [disclosed] documents dealing with FBI coverage of an individual and an organization, the American Friends Service, during a period of domestic turbulence and upheaval add important information to the public domain. Their importance to the public lies not so much in whether they reveal that FBI activity was or was not widespread or intrusive, but rather in what they add to the collective knowledge about our society and the Government's activity in it.

*Flower v. FBI*, 448 F.Supp. 567, 574 (W.D.Tex.1978).

Indeed, in this very case, the Third Circuit aptly observed that the public has an interest in "discovering governmental practices and actions in connection with the Morro Castle disaster and its subsequent investigation." *McDonnell*, 4 F.3d at 1256. McDonnell contends that the documents he received "inherently reveal investigative directions, decisions and omission which, even in a remote sense, fall into the category of 'What our government is up to.'" *McDonnell affidavit*, ¶ 38, at 11. His affidavit sets out at length how the documents he received have helped the public to assess the FBI's performance in investigating this incident. *See Weisberg v. U.S. Dept. of Justice*, 631 F.2d 824 (D.C.Cir. 1980) (photographs "will permit evaluation of the FBI's performance in investigating the King assassination.") Given the mystery which continues to surround this incident 60 years later, the public will benefit from disclosure of the documents in question.

In addition, McDonnell's suit helped to establish and confirm a number of legal principles regarding public disclosure of documents which will benefit the public in future FOIA cases. *See Landano v. U.S. Dept. of Justice*, Civ. No. 90–1953 (D.N.J. Sept. 22, 1994), at 16–17 ("the public benefits from the Supreme Court's guidelines which permit much easier access to government-held information"); *Crooker v. United States Parole Comm'n*, 776 F.2d 366, 367 (1st Cir.1985) (public benefit from establishment of principle that presentence reports are no longer exempt from FOIA because prospect of disclosure may increase governmental accuracy). McDonnell's litigation, in conjunction

with *Landano*, establishes that there is no presumption for withholding witness statements taken during an FBI investigation. This litigation also establishes that federal law does not authorize the withholding of juvenile records requested under FOIA. Finally, it will put the government on notice that FOIA requires that efforts be made to ensure that the documents produced must be legible, even if this requires additional expense on the part of the plaintiff.

In summary, the public benefit from the disclosure of historically significant documents and from the setting of precedent for future FOIA cases weighs significantly in favor of McDonnell. Even if the Court were to accept the Government's contention that McDonnell's interest in the information were primarily personal, this fact would not bar recovery of attorney's fees; any alternative would severely undermine FOIA, since it would put plaintiffs in the untenable position of needing to establish that they did not have a significant personal interest in documents which they may have already litigated for several years to obtain. *See Cazalas v. United States Dept. of Justice*, 709 F.2d 1051, 1053 (5th Cir.1983) ("an acknowledgment of appellant's strong personal interest in securing certain letters and notes is not necessarily inconsistent with an equally strong public interest in also receiving these items.")

Second, both parties acknowledge that plaintiff may potentially receive some commercial benefit for this disclosure, since the material will be incorporated within a book which he intends to sell. It must be noted, however, that "[a] genuine scholarly interest—no matter how specialized—clearly weighs in favor of a successful plaintiff's recovery of fees in a FOIA action." *Long v. IRS*, 932 F.2d 1309, 1316 (9th Cir.1991). This Court concludes that plaintiff's ultimate objective is to "write a well-documented authoritative book about the famous Morro Castle ship fire," *McDonnell affidavit*, ¶ 1, at 1, and the prospect of substantial commercial gain, if even feasible, is secondary.

Third, for the reasons noted above, this Court finds that McDonnell's scholarly interest in the subject matter of the disclosure

also weighs in favor of recovery of attorney fees.

Finally, it is necessary to assess whether the government had a reasonable basis in law for withholding the records in question. Regarding the most significant disclosure of documents—those previously withheld pursuant to Exemption b(7)(D)—this Court concludes that while the Government's position may have initially been reasonable, its refusal to disclose these documents, after the *Landano* decisions, was not reasonably supported by law.

Even if the Government's decision to withhold these documents had merit at the time of the summary judgment motions, the Government was well aware that the Third Circuit subsequently rejected this exact position in *Landano*. Notwithstanding the decision of this Court that Exemption b(7)(D) did not protect several of the documents relating to witness statements, along with the Third Circuit's similar holding in *Landano*, the Government still refused to disclose these documents. Moreover, even after the Supreme Court in *Landano* held that no presumption of nondisclosure existed for such documents, the Government still refused to disclose the documents to McDonnell. It was only after the Third Circuit decision in *McDonnell* acknowledged the Supreme Court decision in *Landano* that the Government finally disclosed the documents in question.

In sum, even if the Government was reasonable in withholding information, the public benefit in disclosure and plaintiff's lack of purely private interests in disclosure, mandates an award of attorney fees which is tailored to the success actually achieved.

### 3. What is a reasonable award of attorney fees?

In the seminal case of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the United States Supreme Court established the standard for determining the reasonableness of attorney fees for a prevailing party. A court should first determine "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," commonly known as the lodestar. *Id.* at 433, 103 S.Ct. at 1939.

This determination, however, does not "end the inquiry"; a court must then consider various factors which could adjust the fee award upward or downward. *Id.* at 434, 103 S.Ct. at 1939–40. *Hensley* noted that "the most critical factor is the degree of success obtained" by the prevailing party. *Id.* at 436, 103 S.Ct. at 1941; *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 918 (3d Cir.1985). This consideration is "particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940; *Institutionalized Juveniles,* 758 F.2d at 918.

Specifically, the court should assess whether "plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. *Hensley* specifically noted that if "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436, 103 S.Ct. at 1941; *Mims v. Shapp,* 744 F.2d 946, 954 (3d Cir.1984); *Student Public Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436, 1455 (3d Cir.1988). Accordingly, a court must reduce the fee award if "it concludes the benefits of the litigation were not substantial enough to merit the full amount of the lodestar." *Poston v. Fox,* 577 F.Supp. 915, 921 (D.N.J. 1984).

In considering the degree of success achieved by the prevailing party, the court does not have the benefit of a "precise rule or formula." *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941; *Student Public Interest Research Group,* 842 F.2d at 1455 ("the district court must exercise its discretion in reducing the fee downward"). Instead, the court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941. The Third Circuit has explained:

> The second method involves a more general reduction of the lodestar, i.e., of the net lodestar amount, taking into account any reduction in the initial lodestar for litigat-ing wholly unsuccessful claims, so that the award provides 'only that amount of fees that is reasonable in relation to the results obtained.'

*Institutionalized Juveniles,* 758 F.2d at 919 (citations omitted). The touchstone, therefore, is that "the appropriate approach to such a reduction is entrusted to the discretion of the court, which can affect a general reduction of the lodestar, completely disallow hours spent on wholly unsuccessful claims or use a combination of both methods." *Student Public Interest Research Group v. Monsanto Co.,* 727 F.Supp. 876, 885 (D.N.J.1989), *citing Institutionalized Juveniles,* 758 F.2d at 925. The court has substantial discretion in making this determination based upon "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Institutionalized Juveniles,* 758 F.2d at 919.

■ Plaintiff's attorney Joseph Hillman, Jr., has submitted a detailed certification in support of his application for fees. The substantial majority of the time was billed by Hillman himself, who billed at $125.00/hour from 1988 until October 10, 1991, and then at $180.00/hour from that date up unto the present. Hillman also notes 81 hours billed by an associate at $100.00/hour, and 18.7 hours billed by Mark A. Sullivan, Jr., Esq., at $125.00/hour. Including $1,023.23 in "out-of-pocket expenses," Hillman has presented a total application in the amount of $55,193.00.

The Court is satisfied that the rates charged by Hillman and his fellow attorneys were appropriate, and that the number of hours expended were proper. Furthermore, it should be noted that the Government has not challenged either the rate or number of hours. Accordingly, the $54,170.00 total submitted by Hillman shall constitute the lodestar.

Nevertheless, based upon the earlier discussion of plaintiff's relative success on the merits of his claims, this Court finds that plaintiff clearly has not succeeded on all of his claims. To the contrary, while plaintiff's victories make him eligible to recover attorney's fees, it is clear that "the fee award

must be reduced to reflect incomplete success."

██ Plaintiff's suit must be considered "successful" because of both the number of claims on which he prevailed and the quality of the information which he received as a result of his victories. Among the valuable documents which the author received were eyewitness statements taken from passengers which address both the crew's conduct and the circumstances surrounding the death of the captain. He received "242 complete pages of material" excluding "information previously withheld in the form of partially redacted information, or the over 100 illegible pages released or submitted as part of the Vaughn index." Plaintiff's reply, p. 1. This included 76 pages of material previously withheld along with portions of another 146 pages released after the Landano decision. Plaintiff's victories also include receiving Rogers' juvenile records and the name of the person determined to be deceased, 10 pages of material addressing the names of individuals determined to be deceased, and legible copies of a substantial number of other documents, as well as several hundreds of additional documents discovered as the result of an additional FBI search.

As noted at length above, the information received by McDonnell assisted him in establishing or verifying numerous theories for his book. Accordingly, for the reasons set out above, an award of a certain amount of attorney fees is appropriate.

Notwithstanding the significance of these victories to McDonnell, however, the Court must note that the plaintiff did not succeed on the majority of his claims. Plaintiff was denied a significant amount of information, including: records withheld because plaintiff failed to exhaust administrative remedies; documents withheld pursuant to national security; records of grand jury proceedings; records compiled for law enforcement purposes which included the identities of various government officials and possible suspects; information pertaining to witnesses who had received express assurances of confidentiality; records which identify certain witnesses interviewed in connection with the investigations; and records which disclosed techniques and procedures for law enforcement investigations and prosecutions. In addition, McDonnell's claim that NISCOM improperly failed to forward his request to other departments within the Navy was also rejected.

██ While McDonnell was sufficiently successful in his litigation, this Court is mindful that a fee award should be reduced to reflect "incomplete success." Student Public Interest Research Group v. AT & T Bell Laboratories, 842 F.2d 1436, 1455 (3d Cir.1988). In determining a reasonable fee award, this Court will avoid a strict mathematical or mechanical approach because this method "provides little aid in determining what is a reasonable fee in light of all the relevant factors." Hensley, 461 U.S. at 436 n. 11, 103 S.Ct. at 1941 n. 11. See Black Grievance Committee v. Philadelphia Elec. Co., 690 F.Supp. 1393, 1397 (E.D.Pa.1988) (rejecting "mechanical comparison" in favor of analysis of "general areas in which relief was sought, the relief requested, and the relief achieved...") This Court will instead follow the example of numerous court which, when appropriate, have employed the "general reduction" method, see Hensley, 461 U.S. at 436–37, 103 S.Ct. at 1941, and reduced the attorney fees by a percentage which the court found to reflect the prevailing party's relative success. See, e.g. Mims v. Shapp, 744 F.2d 946, 955 (3d Cir.1984) (reduction of 50%); Davis v. Southeastern Pennsylvania Transportation Auth., 735 F.Supp. 158, 162 (E.D.Pa.1990) (award reduced by two-thirds); Poston v. Fox, 577 F.Supp. 915, 921 (D.N.J.1984) (reduction of 40%); Student Public Interest Research Group v. Monsanto Co., 727 F.Supp. 876, 887 (D.N.J.1989) (reduction of 20%); Orshan v. Macchiarola, 629 F.Supp. 1014, 1020 (E.D.N.Y.1986) (reduction of 25%); Collins v. Martinez, 751 F.Supp. 16, 18 (D.P.R.1990) (reduction of 40%); McDonald v. Secretary of Health and Human Services, 884 F.2d 1468, 1480 (1st Cir.1989) (reduction of 20%); Brandeis School v. NLRB, 871 F.2d 5, 7 (2d Cir.1989) (reduction of 50%); Childress v. Taylor, 835 F.Supp. 739, 743 (S.D.N.Y.1993) (award reduced by two-thirds).

The general reduction method is clearly the appropriate analysis in the instant case.

Plaintiff's numerous different claims were intertwined, leaving this Court with no principled basis for eliminating specific hours from the fee award. Accordingly, this Court must consider the relief plaintiff achieved in relation to the relief which he sought but did not receive in determining the appropriate size of the fee award.

After reviewing the moving and opposition papers, and drawing upon my own lengthy experience with this litigation, *see Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941, I find that the award sought by plaintiff for attorney fees should be reduced by sixty percent. While plaintiff has obtained substantial relief through his litigation, there can be no gainsaying that the amount of relief denied was greater than that awarded. Furthermore, considerable attorney time was spent litigating the numerous claims upon which plaintiff did not prevail. This was reflected by the briefs and certifications submitted and during the oral arguments before this Court. While the relief awarded to plaintiff benefitted him substantially in his objective, this Court finds that both the total relief obtained and the amount of time plaintiff's attorney necessarily spent on "losing" issues require the conclusions that plaintiff lost more than he won, and that the Government should not be financially accountable for the considerable time spent on pursuing these unsuccessful claims.

Rather than attempting to apply a mechanical formula, this Court has exhaustively reviewed plaintiff's relative success and finds that the accepted lodestar figure should be reduced by sixty percent. Accordingly, plaintiff should be awarded attorney fees in the amount of $21,668.00. Furthermore, the Court finds that the out-of-pocket expenses, i.e., filing fees, sheriff's fee, printing costs, and transcript costs, were necessary for litigating the successful claims, and will therefore also award $1,023.23. Accordingly, plaintiff's total award shall be $22,691.23.